SOCIAL SECURITY ADMINISTRATION BALTIMORE FEDERAL CREDIT UNION, a corporation ₊ duly incorporated under the "Federal Credit Union Act," and Liberty Mutual Insurance Company, Intervenor,

v.

UNITED STATES of America.

Civ. A. No. 7191.

United States District Court
D. Maryland, Civil Division.

Jan. 26, 1956.

■

Z. Townsend Parks, Jr., and Rignal W. Baldwin, Baltimore, Md., for plaintiff.

Jeffrey B. Smith, Baltimore, Md., for intervenor.

George Cochran Doub, U. S. Atty., and Herbert F. Murray, Asst. U. S. Atty., Baltimore, Md., for defendant.

THOMSEN, Chief Judge.

This is an action against the United States under the Federal Tort Claims Act by a Federal credit union to recover losses sustained as the result of embezzlements extending over a period of years by its office manager, Mrs. Naomi Ringrose. An examination and investigation by Federal examiners in March, 1953, disclosed a shortage of approximately $395,000 in members' share accounts not recorded on the books. Mrs. Ringrose pleaded guilty to an indictment charging her with the embezzlement of approximately $34,000. She testified in the case at bar that her defalcations began in the year 1945 and totaled not more than $100,000; but since there was no evidence implicating any one else, it is a reasonable inference that she misappropriated whatever cash was taken. There was no evidence as to the amount taken in any particular year, except that Liberty Mutual Insurance Company, the co-plaintiff, which issued a $75,000 blanket fidelity bond to the credit union in 1952, concluded that $67,-598.42 had been taken by Mrs. Ringrose between January 2, 1952, and March 10, 1953, confirmed a 1951 loss of at least $4,570.85, and, since its bond had a superseded suretyship rider, reimbursed the credit union in the full amount of its bond. The exact amount taken was not proved, but it was probably about $397,-860.25, less such part of that amount as represented dividends credited to the accounts, which figure has never been calculated. The plaintiff credit union salvaged $49,966.21, in addition to the $75,000 paid by the Liberty Mutual under its blanket fidelity bond.

From 1934 to 1943 Federal credit unions were under the supervision of the Farm Credit Administration. From 1943 to 1948 they were under the supervision of the Federal Deposit Insurance Corporation. From 1948 to date they have been under the supervision of the Bureau of Federal Credit Unions, the Director of which is appointed by the Secretary of the Department of Health, Education and Welfare. These agencies will be referred to collectively as "the Bureau".

Plaintiffs contend that examiners of the Bureau were negligent in failing to discover the embezzlements and in the manner in which they reported to the credit union the conditions which they did find. There is no contention that any examiners had actual knowledge of the embezzlements prior to their discovery by Examiner Davis in 1953, and plaintiffs' principal contention is that the examinations made by the Bureau should have been more thorough.

The defenses raised by the government present the following issues:

I. Whether the government owed any duty to plaintiff credit union in connection with the examinations which can be made the basis of a claim under the Federal Tort Claims Act; and, if so

II. The nature and extent of such duty;

III. Whether the government was guilty of any negligent breach of that duty which was a proximate cause of the loss, and which does not come within the "discretionary function" exception, 28 U.S.C.A. § 2680(a), or the "misrepresentation" exception, 28 U.S.C.A. § 2680 (h);

IV. Whether plaintiffs' claim is barred by contributory negligence; and

V. Whether all or any part of plaintiffs' claim is barred by limitations, 28 U.S.C.A. § 2401(b).

### Federal Credit Unions

Plaintiff credit union is a cooperative association of employees of the Social Security Administration organized as a Federal credit union under the Federal Credit Union Act, 48 Stat. 1216, as amended, 12 U.S.C.A. § 1751 et seq. There are 7,778 credit unions organized under this Act, and approximately 8,000 under State laws. Plaintiff credit union could have been organized under either State or Federal law, and the fact that its members are employees of the Federal government is not significant.

Under the Federal Act the charter of a proposed Federal credit union must be presented to the Director of the Bureau for approval. 12 U.S.C.A. § 1756 provides that Federal credit unions shall be under the supervision of the Director, shall make such financial reports to him as he may require, and shall be subject to examination by, and for this purpose shall make its books and records accessible to, any person designated by the Director. The Director fixes a scale of examination fees to be paid by the credit unions, in addition to a $10 annual supervision fee.

Supervision by the Bureau of individual credit unions is committed to the Division of Field Operations, which has six regional offices, each headed by a regional representative. In 1948 fifty examiners were employed to make periodic examinations of the 4,000 credit unions then existing. In 1955 there were 174 examiners to supervise nearly 8,000 credit unions. The number of examiners has been limited by the budget Congress has made available for this purpose. Due to the shortage of examiners the Bureau has never been able to examine all credit unions each year, and the average examiner, usually acting alone, must examine 35 to 70 credit unions per year, depending upon their size, location, conditions found, etc. Plaintiff credit union was supervised from the Atlanta Regional Office, out of which 7 field examiners supervised 512 credit unions. More examiners were not assigned to the Atlanta region because of the budgetary limitations.

From 1945 to 1952 the Civil Service requirements for employment as a field examiner by the Bureau, were: four years of progressively responsible experience in performing accounting or bookkeeping duties of a commercial type, including one year as a credit union examiner for either a state or federal supervisory authority or as the responsible manager of the affairs of a credit union under federal or state charter. For the other three years, a study in accounting subjects above high school level could be substituted on the basis of one full year's study for nine months of experience. The field examiners who examined plaintiff credit union were not certified public accountants; such accountants rarely accept employment by the Bureau, and even more rarely remain in such employment, because of the limited salaries paid. Starting salaries for examiners are as follows: Grade 5—$3,670; Grade 7—$4,525; Grade 9—$5,440. These salaries and the number of examiners in each grade are fixed by Congress.

The regional representative checks each examiner's report and work papers, to see that all required steps have been taken by the examiner, to review the policy questions involved, and to edit the report.

The Director has determined that most credit unions, including the plaintiff, shall receive portions of the reports of examination made to him by the examiners, but that some credit unions shall not receive any reports but shall merely receive a letter confirming any recommendations which the examiners made orally to the credit union at the time of examination.

The regional representative ordinarily decides what should be emphasized in the letter of transmittal which accompanies the report.

The charter and by-laws of plaintiff credit union are in the standard form approved by the Bureau. From time to time the Bureau issues and distributes

to Federal credit unions a Federal Credit Union Handbook and a Supervisory Committee Manual. References herein to the Handbook are to the July, 1947, edition, Pl.Ex. 72; references to the Manual are to the April, 1949, edition, Pl.Ex. 49.

The statute, 12 U.S.C.A. § 1761, provides that a Federal credit union shall be managed by a board of not less than five directors elected by the members and from their number. The Handbook emphasizes that the directors have a duty of control and "should set up procedures that will let them know what is going on. * * * The board should have a planned program for maintaining control" (p. 13), and "should see that the supervisory committee functions" and makes the audits the Act requires the supervisory committee to make (pp. 23, 24, 27).

The president of the credit union is specifically enjoined to act upon reports of the Federal examiners, and to see that any incorrect practices are promptly corrected. Handbook, p. 33. If the supervisory committee does not function, he should call a special meeting of the members of the credit union to suspend the members of the committee and replace them with members who will function. By-laws, Article V, Section 3.

The statute makes the treasurer the general manager of the corporation. He has custody of all funds and records and is required to prepare a monthly financial statement for submission to the board and posting in the credit union office, and to submit such financial reports to the Bureau as it may require. He is the only officer compensated for his services.

The statute provides for a supervisory committee of three members, a majority of whom shall not be directors, elected by the members from their number, sec. 1761(a). The supervisory committee is charged by the statute, sec. 1761(e), with the duty of making quarterly "audits" and an annual "audit" of the books of the credit union. This statutory duty is also set out in the Handbook, the Supervisory Committee Manual and the by-laws of the plaintiff credit union. The committee has the power to call a meeting of the members to consider any violation of the statute, charter or by-laws, or any practice of the corporation deemed by the committee to be unsafe or unauthorized. The committee is required by statute, sec. 1761(e), and by the by-laws to verify the passbooks and accounts of the members with the records of the treasurer from time to time and not less frequently than once every two years.

### The Nature of the Cause of Action.

The relevant provisions of the Federal Tort Claims Act are 28 U.S.C.A. §§ 1346(b), 2674, 2680(a) and 2680(h):

1346(b). " * * * the district courts * * * shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."

2674. "The United States shall be liable * * * in the same manner and to the same extent as a private individual under like circumstances, * * *."

2680. "The provisions of this chapter and section 1346(b) of this title shall not apply to—

"(a) Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a dis-

cretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

\* \* \* \* \* \*

"(h) Any claim arising out of \* \* \* misrepresentation, deceit, or interference with contract rights."

■■ Plaintiffs base their case on alleged *negligent* acts or omissions. Plaintiffs therefore must prove all three of the elements of actionable negligence: (1) some duty on the part of defendant to protect plaintiff credit union from the injury of which it complains; (2) failure by defendant to perform that duty; and (3) an injury to plaintiff credit union which was proximately caused by such failure. Cooley on Torts, 3d Ed., p. 414; State, to Use of Lorenz v. Machen, 164 Md. 579, 165 A. 695. "The plaintiff must bring himself within the scope of a definite obligation so that it might be regarded as personal to him." Prosser, Law of Torts, 1955 Ed., p. 167. "Negligence in the air, so to speak, will not do." Pollock, Law of Torts, 13th ed. (1929), p. 468.

### The Question of Duty.

Before setting out in detail the findings of fact—what the examiners and other employees of the Bureau did and did not do over the years, and what the officers, directors and supervisory committee of the plaintiff credit union did and did not do—we should consider whether the government owed any duty to plaintiff credit union which can be made the basis of such a claim as is presented in this case.

Plaintiffs contend that the government owed plaintiff credit union a duty to make such periodic examinations or audits as prudent examiners would make under like circumstances for the purpose of verifying plaintiff's accounts and records, and to communicate to the credit union what that examination disclosed. Plaintiffs contend that this duty was owed by the government to each of the 7,000-odd Federal credit unions individually, and that negligent acts or omissions of government employees in making such examinations may, if the credit union sustains a loss because of defalcations by its trusted officers or employees, give the credit union and the insurance company which insured the fidelity of those officers and employees, the right to recover that loss from the government. Plaintiffs contend that this duty is imposed on the government by statute, and has been assumed by the government apart from the statute in a number of ways.

### The Statutes.

■ No statute imposes such a duty on the government. As we have seen, 12 U.S.C.A. § 1756 provides that Federal credit unions shall be under the supervision of the Director and shall make such financial reports to him, at least annually, as he may require. It further provides that each Federal credit union shall be subject to examination by, and for this purpose shall make its books and records accessible to, any person designated by the Director.

This provision is essentially similar to the provisions of Title 12 U.S.C.A. dealing with the examination of National Banks, member banks of the Federal Reserve System, Federal Land Banks, National Agricultural Credit Corporations, Federal Home Loan Banks and Federal Building and Loan Associations. Secs. 161, 248, 481, 952, 1243, 1440, 1720. The purposes of such examinations have been stated many times; two quotations will suffice here. Preston Delano, Comptroller of the Treasury, told the Joint Committee on the Economic Report, 82d Congress, 2d Session (1952), Senate Doc. No. 123, Pt. 2, p. 901:

"It cannot be emphasized too strongly that bank examination does not involve a complete audit of the institution. It has always been understood that the primary function of governmental bank examination is to judge the assets and the operations of banks, and to effect improvements therein, wherever neces-

sary, through recommendations or definite orders. National banks, like banks of the State systems, must be operated in accordance with applicable laws and regulations, as well as in accordance with principles of safe and sound banking practices. Accordingly, the chief duty of a national bank examiner is to ascertain that the statutory requirements and restrictions enacted by Congress, and administrative regulations adopted thereunder, are being complied with, and that the lending and investment policies of the bank, and its operating procedures, are such as to minimize the dangers to the banking system which are inherent in excessive and hazardous loans, investments which are speculative or not readily marketable, obsolete or inadequate internal practices, inefficient personnel, and the like."

This is in line with a statement by Attorney General Wickersham, 29 Op.Atty. Gen. 555, 560, quoted by Chief Judge Groner in Bank of America, etc. v. Douglas, 70 App.D.C. 221, 105 F.2d 100, 104, 123 A.L.R. 1266, as follows:

"Thus the banking laws clothe the Comptroller with authority to examine into the affairs of national banks for three main purposes: First, to ascertain the financial condition and soundness of management of national banks; second, to determine whether or not such banks are operating in conformity with the banking laws; third, to enable him to recommend amendments to the existing law. * * *"

These examinations, including examinations of credit unions by the Bureau, are made for the purpose of supplying the Comptroller or the Director or other administrative officer of the government with information necessary to perform his regulatory function. They are not made as a service to the bank or the credit union. The detection of fraud is not a primary function of the examinations, nor is the verification of accounts. The Development of Bank Supervision in the United States, 1949, published by the Federal Deposit Insurance Corporation, p. 48; Audit Aid for Small and Moderate-sized Banks, 1950, published by the Surety Association of America, p. 2; Audit Schedule Control Book, 1949, published by The National Association of Bank Auditors and Comptrollers, p. 3; How to set up an Audit Program in the Smaller Bank, 1953, published by the American Bankers Association, p. vi. Even in the usual audit made by certified public accountants, the primary purpose is not the discovery of defalcations, but rather the expression of professional opinion concerning financial position and operating results. Levy, Accountants' Legal Responsibility, p. 13. "The ordinary examination incident to the issuance of an opinion respecting financial statements is not designed and cannot be relied upon to disclose the defalcations and other similar irregularities, although their discovery frequently results. In a well organized concern reliance for the detection of such irregularities is placed principally upon the maintenance of an adequate system of accounting records with appropriate internal control. If an auditor were to attempt to discover defalcations and similar irregularities, he would have to extend his work to a point where its cost would be prohibitive. It is generally recognized that good internal control and surety bonds provide protection much more cheaply." Levy, p. 13, quoting the Committee on Auditing Procedure of the American Institute of Accountants.

Of course, if a defalcation is discovered or suspected in the course of a Comptroller's or Bureau examination, the facts should be communicated to the proper officials of the bank or the credit union, unless the Comptroller or the Director decides that more drastic action is necessary, such as closing the credit union altogether. 12 U.S.C.A. § 1766; cf. Fahey v. Mallonee, 332 U.S. 245, 67 S.Ct. 1552, 91 L.Ed. 2030. Such communication is made in the exercise

of the regulatory function, not because the statute imposes any duty on the Comptroller or the Director to do so.

In Jarvis v. Kepp, (D.C.E.D.Ill.), 1928, unreported, Judge Wham held that the examinations of member banks by a Federal Reserve Bank under what is now 12 U.S.C.A. § 248(a) were not intended by Congress as a direct protection to the depositors or other creditors of the member banks.

 The verification of accounts is the responsibility of the officers and directors of a bank, and of the supervisory committee of a credit union. In the case of a credit union it is made their responsibility by statute, 12 U.S.C.A. § 1761(e), discussed above, and by the charter, by-laws, Handbook and Supervisory Committee Manual. The statute requires them to make at least quarterly, an "examination of the affairs of the Federal credit union, including an audit of its books", and "an annual audit and a report". The principal purpose of that audit is to verify the books and records. If the members of the supervisory committee are not qualified or willing to do this work, they should employ an independent accountant to make such an audit, as banks and building associations, large and small, customarily do.

In some of the documents offered in evidence the words "examination" and "audit" seem to be used interchangeably. In others there appears to be some difference in meaning intended. Several witnesses testified on the point, but their testimony did not agree. For the purposes of this case, it is sufficient to note that an examination may be an audit, or may include an audit. The important question is: what type of audit, and for what purpose or purposes. In the Federal Credit Union Act the word "examination" is used to describe what the Bureau examiners do. This examination customarily includes an audit, but not a comprehensive audit, nor an audit the principal purpose of which is to verify the accounts and records of the credit union, although some verification of accounts and records is necessary.

The principal purpose of the audit, as of the entire examination, is to supply the Director with information.

Plaintiffs contend that their position is supported by the statement made in 1937 by William I. Meyers, Governor of the Bureau of Federal Credit Unions at the time the Federal Credit Union Act was amended to eliminate the following provision, which was originally a part of section 6, 12 U.S.C.A. § 1756:

"Provided, however, That if a Federal credit union has assets of less than $25,000 the Governor may accept the audit report of a practicing public accountant in place of such examination and may relieve such Federal credit union of the obligation to pay the examination fee required by this section."

The Governor said in part:

"* * * Our experience has indicated that it is necessary that Federal credit unions be examined by persons who are trained in this type of examination work and who are under obligation to report on practices which conflict with the law, by-laws, and any regulation issued by the Governor. It would not be satisfactory to have practicing public accountants examine Federal credit unions."

This statement supports my conclusion that the purpose of the statutory examination is to supply the Governor (now Director) with information necessary to regulate the credit union, and not to verify accounts and discover defalcations, which independent public accountants can do as well as or better than government examiners.

 The Federal Tort Claims Act did not create any new duties; it waived the defense of sovereign immunity with respect to certain causes of action which could have been enforced before that Act except for that defense. Feres v. United States, 340 U.S. 135, 142, 71 S.Ct. 153, 95 L.Ed. 152; Dalehite v. United States, 346 U.S. 15, 42, 73 S.Ct. 956, 97 L.Ed. 1427. The later

648

case of Indian Towing Co., Inc., v. United States, 350 U.S. 61, 76 S.Ct. 122, holds that the defense of governmental function is no longer available either, in many cases at least. But that decision does not aid plaintiffs in this case, because we are not dealing here with the defense of governmental function, but with the nature and purpose of the examinations which the Bureau is directed to make by the Federal Credit Union Act. I have been referred to no decision or other authority, either before or after the passage of the Tort Claims Act, in which it has been suggested that the government owes a bank, building association or credit union any such duty as is claimed by plaintiffs in this case.

### Alleged Assumption of Duty.

█ Plaintiffs contend that even if the statute does not impose a duty on the Bureau to make such audits for the benefit of the individual credit unions, the Bureau assumed that duty. If it be true that the government induced the officials of the plaintiff credit union to rely on the examinations made by the Bureau examiners, and to disregard the duties placed on the officials of the credit union by the statute, by-laws, etc., the government would be obligated to exercise reasonable care under the circumstances in the performance of what the plaintiff credit union had been led to believe the government had undertaken to do. Indian Towing Co. v. United States, 350 U.S. 61, 76 S.Ct. 122.

We must examine the items on which plaintiffs claim the officials of the credit union relied in order to determine what, if anything, the officials had the right to assume the government had undertaken to do. We must then examine the facts of the case to find whether the government was negligent in the performance of any obligation it may have undertaken, whether any such negligence was the proximate cause of the loss, and whether plaintiffs' claim is barred by contributory negligence.

Plaintiffs refer to pamphlets promoting Federal credit unions issued by the Bureau, one of which, issued before 1943, said: "The Farm Credit Administration makes a periodical examination of the books and records of the credit union." The same pamphlet contained the statement: "The supervisory committee of three members must audit the books of the credit union at least quarterly. It also reports to the members annually as to the condition of their credit union and the manner in which their interests have been safeguarded." The more recent pamphlets, under the heading "Safety", include, *inter alia*, the following statements: "The affairs of the credit union and the records of the treasurer are subject to frequent audits by the supervisory committee which is responsible only to the members." and "All Federal credit unions are supervised and periodically examined by the Bureau of Federal Credit Unions." The Federal Credit Union Handbook contains the statement: "Federal Credit Union examination reports reflect analysis of the credit union by thoroughly trained and experienced specialists in credit union affairs." None of these statements indicate that the government assumed the duty to verify the accounts and records of credit unions.

The officials of the plaintiff credit union had never seen the examiners' guide before the trial of this case, and therefore cannot rely on anything therein to show what its officials assumed the examiners had done. The guide may be considered in determining the standard of care to which the examiners should be held in making their examinations, whether or not we conclude that the government owed any legally enforceable duty to the individual credit unions in connection with those examinations.

In March, 1952, Malone, the President of the plaintiff credit union, told Rodgers, the examiner who made the 1952 examination, "he would like to have as

good an examination as possible". Rodgers testified: "I agreed to do it. I did not agree to give a detailed audit." I find as a fact that this conversation took place substantially as Rodgers testified. I find as a fact that Rodgers did not promise, as Malone testified, that he would "make a representative audit of the accounts and records" and give plaintiff credit union "assurance of their correctness". He had no authority to make such a promise.

Plaintiff's principal argument is based upon reports of examination which the Bureau furnished to plaintiff credit union from time to time, and to the certificates which appeared on the cover or first page of these reports. On all reports before 1952, the certificate read:

"This Report of Examination is furnished to the directors of the examined Federal Credit Union for their information and consideration. It is desired that each director, credit committee member, and supervisory committee member in keeping with his responsibilities to the members, review its contents.

"This Report is strictly confidential. The credit union shall under no circumstances publish, or make public in any manner, this Report of Examination or any portion thereof.

"The information contained herein is based upon the records and books of the credit union, upon statements made to the Examiner by directors, officers, employees, and committee members and upon information derived from other sources which the Examiner considered reliable and correct."

On the 1952 report, the certificate read:

"This Report of Examination is furnished to the directors and committee members of this Federal Credit Union for their information and consideration. Each director and each member of the credit and supervisory committee should review its contents in keeping with his responsibilities to the members.

"This examination was made in accordance with generally accepted auditing standards and accordingly included such tests of the accounting records and such other auditing procedures as were considered advisable in the circumstances.

"The information contained herein is based upon the records and books of the credit union, upon statements made to the Examiner by directors, officers, employees and committee members, and upon information derived from other sources which the Examiner considered reliable and correct.

"This report is confidential and shall not be published or made public in any manner."

It is obvious that the first form of certificate says nothing which would indicate that the examiner had made a detailed audit, or that the government was assuming the duty of verifying any books or records whatsoever.

The later form of certificate presents a different problem. The second paragraph is similar to a representation which appears in the certificate commonly furnished by certified public accountants. That representation, however, appears to be the statement of a standard of care, rather than an assumption of duty.

The C. P. A. certificate also contains the following certification, which does not appear in the government form:

"In our opinion, the accompanying balance sheet and statements of income and surplus present fairly the financial position of X Company at December 31, 19—— and the results of its operations for the year then ended in conformity with generally accepted accounting principles, applied on a basis consistent with that of the preceding year."

Neither the old form nor the new form on the Bureau's report of examination

contained any similar certification. Both forms contained the statement:

> "The information contained herein is based upon the records and books of the credit union, upon statements made to the Examiner by directors, officers, employees and committee members, and upon information derived from other sources which the Examiner considered reliable and correct."

Both forms stated in the first paragraph that the report was furnished to the credit union to assist the officers, directors and supervisory committee to fulfill their responsibilities.

■ Allen, Chief of Division of Field Operations of the Bureau, testified that the new form was adopted because some credit unions had the mistaken idea that they were receiving a detailed audit, and that the new form was intended to make it clear that they were not. If that was the purpose of the change, inappropriate language was adopted. But the question we are now considering is whether either certificate, the earlier or the later, amounted to an assumption by the government of a duty to verify the accounts and records, upon which the credit union had the right to rely, despite the provisions of the statute, the charter, the by-laws, the Handbook and the Supervisory Committee Manual, all of which placed the duty of auditing the books and records on the supervisory committee. I hold that neither form amounted to the assumption by the government of a duty to make such an audit for the benefit of the credit union.

■ While the government owed no duty to the plaintiff credit union to make an audit, to verify accounts and records, or to make reports to the plaintiff credit union of what the examiners found, nevertheless, if an examiner did make some sort of an audit in the course of his examination, and the Bureau sent a report of examination to the plaintiff credit union, the government was obligated not to furnish a report which would be a trap for the ignorant or unwary. Somerset Seafood Co. v. United States, 4 Cir., 193 F.2d 631, 635.

What, if anything, the plaintiff credit union was entitled to rely on in this connection must be determined from the contents of the reports sent to the plaintiff credit union, and the conversations and correspondence between representatives of the Bureau and officials of the credit union, in the light of the statute, Handbook, Supervisory Committee Manual, charter and by-laws, discussed above.

Plaintiffs admit that the government did not assume an absolute duty to detect defalcations or to make such a comprehensive audit as would assure their detection. Independent certified public accountants engaged by banks and others to audit their books do not assume such a duty, unless they specifically assume it in their contract. See Levy, p. 13, quoted above. In National Surety Corp. v. Lybrand, 256 App.Div. 226, 9 N.Y.S.2d 554, 562, the court said:

> "The extent of an accountant's duty is well defined in Matter of London & General Bank, L.R. (1895) 2 Ch. 673, 682. Not only must he examine the books but, *if that be his contract,* he must satisfy himself with reasonable diligence that the books 'show the true financial position of the company'." (Emphasis supplied.)

In the case at bar there was no contract, but plaintiffs contend that the government assumed a duty to the plaintiff credit union to make such an examination or audit as a prudent examiner would make under like circumstances for the purpose of verifying the accounts and records of the credit union and to report the result of that examination to the individual credit unions. What did the credit union have the right to assume the examiners had done?

■ The 1952 certificate stated that generally accepted auditing standards had been followed, and indicated that some tests of the accounting records had been made. If that representation was false, such misrepresentation might

be a tort, but not a tort for which recovery may be had under the Federal Tort Claims Act, 28 U.S.C.A. § 2680(h). Jones v. United States, 2 Cir., 207 F.2d 563.

We must consider the entire course of dealings between the parties to determine: (1) whether, in making the examinations and in reporting what was learned therefrom, the government led the plaintiff credit union to assume that the Bureau had undertaken to relieve the officials of the duties imposed upon them by the statute, the by-laws, etc.; (2) whether the government was guilty of any negligence in the performance of any such undertaking which would not come within the discretionary function exception; and (3) whether the officers, directors and supervisory committee of plaintiff credit union were guilty of contributory negligence.

### Facts.

Plaintiff credit union was organized in 1938. Its office was in the Candler Building in Baltimore, Md., one of the buildings occupied by the Social Security Administration and in which some of the officials of the credit union worked. The first office manager of the credit union left around 1941; Mrs. Ringrose, who had been employed as his assistant, was appointed office manager shortly thereafter and retained that position until her defalcations were discovered on March 2, 1953.

Mrs. Ringrose had formerly been employed by the National Cash Register Company as a demonstrator of bookkeeping machines. The credit union had purchased a posting and control machine from that company in 1940. At the time the purchase of this machine was under consideration, the Bureau had approved its use, provided certain other records were kept in the manner required by the accounting manual. These provisions were never observed by plaintiff credit union.

Various types of bookkeeping and posting machines for credit unions were sold by several companies. Some, including the one ordered by the plaintiff credit union, had unique combinations of keys or other unusual features, devised to meet the needs of individual credit unions. All of these machines, including the National machine purchased by the plaintiff union, contained various control features, which, if properly used and checked, would facilitate the discovery of defalcations. The Bureau permitted each credit union to make such use of these control features as the credit union wished. The Bureau relied on the journal and cash record and other handwritten records which the Handbook and the Accounting Manual required the credit unions to keep, and trained its examiners to base their examinations on the required records. It was established Bureau practice not to require examiners to check the tapes from the machines and they were not trained in the operation of the various types of machines.

Plaintiff credit union did not utilize the control features of its machine; but the machine tapes were preserved, and if they had been examined critically at any time by the treasurer, the supervisory committee, the examiners, or anyone else, they would probably have led to a discovery of the defalcations. However, Mrs. Ringrose soon learned that no one was checking the tapes, that the officers and directors of the credit union were leaving the entire management of the office to her, that they were not making any real effort to review what she was doing, and that the supervisory committee was neither making the audits nor verifying the members' passbooks and accounts with the records of the treasurer, as they were supposed to do.

For a long time Mrs. Ringrose was the only employee of the credit union who operated the posting machine. Toward the latter part of the period involved, two other women clerks were employed, but only one of them operated the machine, and she made only certain types of entries. Substantially all of the bookkeeping except the entries on

passbooks and members' ledger cards was done by Mrs. Ringrose.

Soon after she was employed, Mrs. Ringrose noted that the machine lacked a safety device which would prevent the ER (error) key from being used improperly. She spoke to the National Cash Register agent about it; he spoke to the then president of plaintiff credit union, and reported back to Mrs. Ringrose that the president was unwilling to spend any more money on the machine. Shortly thereafter Mrs. Ringrose began her depredations.

Her system was simple. She would abstract cash from the cash receipts taken in at the office window or sent in by collectors; she would post the correct amount to the credit of the depositor in his passbook and on his individual ledger card, but would use the ER key on the machine to prevent the amounts abstracted from appearing in the daily cash total. She would keep an accurate record of the amounts so abstracted, and would withdraw from their normal place in the filing cabinet a sufficient number of members' ledger cards (sometimes called share cards) to balance the cash taken, so that the total of the balances on the members' ledger cards which remained in their normal place in the cabinet would agree with the control account in the general ledger. This account was posted from the journal and cash records, in which Mrs. Ringrose would enter the corrected figures from the month-end take-off cards.

Mrs. Ringrose kept the cards for active accounts in one stack, inactive accounts in a second stack, closed accounts in a third stack, and the accounts which she had withdrawn in a fourth stack in the same cabinet. The fourth stack grew until it was 6 to 10 inches thick, and was sometimes referred to at the trial as the "6-inch pack". She was careful to keep in the 6-inch pack mostly cards which were inactive, because whenever any depositor whose card she had abstracted called for all or part of his money, she either had to produce the money from her own funds or withdraw

another card or cards with the same or approximately the same balance in place of the card of the depositor who had asked for his money. Any discrepancy would have to be taken care of by a correction somewhere. Naturally, she took no vacations.

When a Bureau examiner came to the office, Mrs. Ringrose would remove from the cabinet the 6-inch pack representing her defalcations, and hide it in her desk. Since the cards remaining in the cabinet after Mrs. Ringrose had abstracted the 6-inch pack always balanced exactly or almost exactly with the control account in the ledger, the Bureau examiners did not suspect the existence of the additional cards which had been abstracted until examiner Davis made certain discoveries in 1953. The audit incident to an ordinary Bureau examination did not involve a detailed check of the members' ledger cards. None of the examiners until Davis, who made the 1953 examination, ever felt that the circumstances were sufficiently suspicious to require a detailed audit for any period. In a number of cases examiners noticed corrections on various accounts and asked Mrs. Ringrose about them. In every case up to 1952 her explanations satisfied the examiner. The 1952 instance will be discussed below.

In 1951, when the supervisory committee of the credit union made a partial check of the members' passbooks and accounts, Committeeman Ruth found that his card was not in the place where it should have been. Mrs. Ringrose produced it for him out of the 6-inch pack. He had the same experience with some other share cards he was looking for. Ruth's suspicions were not sufficiently aroused to cause him to pursue the matter further, although he has held responsible positions in the Methods Branch of the Social Security Administration. Of course, if he had run a tape on all the cards in the file, including the 6-inch pack out of which his card had been taken, the shortage would have been discovered immediately.

The treasurer of the credit union never prepared a statement himself, but always accepted the statements prepared for him by Mrs. Ringrose.

The supervisory committee members made a pretense of carrying out their duties. They filled out and filed the quarterly reports required of them by the statute, by-laws, etc., but they certified to the condition of the books without making any effort whatever to see that their certifications were correct. The figures which they entered in their reports were regularly given them by Mrs. Ringrose and accepted by them without question, audit or check, although one or more of them had studied accounting and had some bookkeeping experience. Indeed, on all but two of the quarterly audit reports, all or most of the answers were written in by Mrs. Ringrose herself, who wanted to be sure the reports were in the book before the examiners came. If the supervisory committee had checked the tapes from the bookkeeping machine or had made a detailed check of the ledger cards posted from that machine, they would have noticed a great many errors and discrepancies. They certified over and over again that they had verified all or substantially all of the members' passbooks during the preceding two year period, when, in fact, they never verified more than a small fraction of the passbooks. These and other false and reckless statements were repeated quarter after quarter, year after year. Many of the members of the supervisory committee never bothered to read the statute, charter, by-laws, Handbook or Supervisory Committee Manual. Nor did the president read most of these documents or pay any attention to those which he did read. He knew that the supervisory committee was not doing its duty and made no effort to bring that fact to the attention of the directors or the members.

The directors of the credit union met from time to time and listened to the reports and recommendations made to them orally by the examiners and in written reports of examination. The directors did very little to carry out the recommendations.

Examiner Gahan made examinations of plaintiff credit union in April, 1947, and June, 1948. On his first visit in 1947 he reconciled the cash and returned to complete the work a week later. During both examinations he made such test checks as he deemed necessary and found nothing to cause him to suspect fraud or embezzlement. In his 1948 report he criticized the facts that cash receipts and disbursements were not balanced and entered in the book of original entry each day, that recorded cash receipts could not always be identified with bank deposits, and that the supervisory committee was not making the required audits and the verifications of passbooks. He found a difference of $200 between the subsidiary loan account and the control account. He made reasonable efforts to locate this difference, and reported it to his supervisor at the Bureau, who decided that it was up to the credit union to do the detail work to locate the discrepancy and that the examiner should initiate corrective measures, which he did. In December, 1948, the vice-president of the credit union wrote the Bureau that the criticism with respect to the journal and cash entries had been corrected, but that it was not practicable to follow the recommendations that deposits be made in such a way that they could be identified, and that it was impossible for the supervisory committee to comply with the requirements for verification of passbooks.

Examiner Hallissey made the examination in 1949. He noted frequent overdrawn balances in the checking account; that checks were customarily countersigned in blank; that the journal and cash records were not being maintained as required; that entries in the journal and cash record were compiled on a monthly basis at the end of each month rather than on the required daily basis;

and that the supervisory committee had not placed the passbook audit list in actual operation.

In March, 1951, Examiner Cowart postponed the original examination date two weeks at the request of Mrs. Ringrose because she told him that "individual ledger cards were pulled and stacked on the counter in anticipation of, I believe, the next day's collections". He noted and reported the impossibility of identifying bank deposits with the receipts of any particular day or days. He found a difference of $10.71 between the total of the individual card balances and an adding machine tape previously run by Mrs. Ringrose. He noted the large number of corrections on some of the ledger cards. During the course of his examination he discussed these matters in Washington with his supervisor, and took them up with the treasurer of the credit union, who was irritated and said that he thought the Bureau would loosely supervise the credit union and would not pin them down to any particular type of bookkeeping. Cowart also reported these matters, together with the unsatisfactory state of the entries in the journal and cash record, in his report of examination. This report was sent to the president of the credit union by Wright, the acting regional representative, who called attention to the fact that "Examiner Cowart has pointed out in the report and in his discussions the several unsound procedures or practices which caused the present operation to fall substantially short of an acceptable accounting system. Previous examination reports have also commented upon improper practices." Wright insisted that the method of record keeping be placed in conformity with the manual. He instructed the president that a copy of the report should be made available to each official and reviewed in accordance with his responsibility, and that it should be thoroughly discussed at a joint meeting of the board of directors, the credit committee and the supervisory committee. He asked the president to send him a copy of the minutes of this meeting and a report of the actions taken in connection with the matters commented upon. The credit union did not reply to this letter until February, 1952, although the Bureau sent two follow-up requests. At a meeting in May, 1951, called to receive and consider Cowart's report, the supervisory committee promised to run the tapes, but never did so. The original report of examination has the single word "adjusted" in pencil opposite the report of the $10.71 difference. The letter of February 5, 1952, from the president of the credit union to the Bureau stated: "We have not been able to find the $10.71 difference between the share accounts and the control account. A discrepancy of $.40 was found which appears to bring the two amounts into balance."

Several of the officials of the credit union wrote or testified that Cowart's report left them speechless. They took the position that some of the procedures criticized by Cowart and Wright had been approved by the Bureau when the bookkeeping machine was approved, and that it did not fall "within the legitimate activities of the Bureau" to review the matter. However, the letter written by Orchard, Director of the Bureau in 1940, had approved the use of the bookkeeping machine subject to certain conditions which the credit union had not observed.

Year after year the examiners criticized the way the books were being kept. The officials of the credit union sometimes replied that they would see that the conditions were corrected, but they seldom did anything. They said that the proposed corrections in bookkeeping methods would delay the service to the members, and they felt that rendering quick service to members was more important than following the suggestions of the Bureau with respect to the method of handling receipts and keeping records. In practice, they permitted Mrs. Ringrose to do exactly what she pleased despite the criticisms of the Bureau.

Mrs. Ringrose worked 30 hours a week, for a salary of $2,400 per year.

Some of the officials of plaintiff credit union visited her in her new home, located in the most fashionable residential district in Baltimore.

At the time the Liberty Mutual issued its blanket fidelity bond early in 1952, a representative of that company surveyed the operations of plaintiff credit union and made a number of recommendations, including the use of prenumbered duplicate receipts, and account control by the supervisory committee and the treasurer. If the credit union had followed these recommendations, the defalcations would have been promptly discovered.

Examiner Rodgers came to the office of the credit union on March 4, 1952, accompanied by Cowart, who had made the 1951 examination. They found that the journal and cash record and the ledger had not been posted for January and February. They first attempted to reconcile the cash and found an apparent shortage of $1,208.24. While they were checking the bank statements, deposit records, etc., in an attempt to reconcile this discrepancy, Rodgers was taken ill and had to suspend work for a day and a half. Cowart also left, because he had an appointment to indoctrinate a new credit union. On March 6, when Rodgers returned, the cash balanced. Several deposits had been made in the meantime, and it was impossible to check against the figures he had on March 4. Rodgers testified that he could not find any error in his March 4 calculations. Mrs. Ringrose testified that this $1,208.-24 difference was "legitimate", caused by late depositing, and was not part of her depredations; that she had found the $1,208.24, and did not deposit $1,208.24 of her own. It is impossible to tell at this time what a further check on March 4, 1952, would have shown.

Rodgers was not satisfied with the situation and called it to the attention of the Board of Directors. He also got in touch with his supervisor and with the Chief of Division of Field Operations of the Bureau to determine what further action should be taken. Under Bureau regulations authority for a detailed audit must be given by a supervisor, and the decision of the supervisor and the Chief of Division was that Rodgers should continue with an ordinary audit and return later for a surprise cash reconciliation. Rodgers proceeded with the audit, handicapped, as his predecessors had been, by the delayed and mixed depositing of receipts and the unsatisfactory bookkeeping. At the conclusion of his examination he had a meeting with the officials of the credit union on March 20, 1952, at which ten out of eleven directors were present, as well as all members of the credit committee and of the supervisory committee. He presented his report, with his conclusions and recommendations, and discussed with the officials the serious condition of the records of the credit union. The criticisms covered the irregular depositing of cash receipts, the failure to keep the journal and cash record as required, the fact that the general ledger had not been maintained accurately and was used as a journal as well as a ledger, the failure of the collectors to give receipts for money collected, the general absence of an adequate control system for collections, and the failure of the supervisory committee to verify passbooks and accounts.

Rodgers' confidential report to his superiors stated: "When the true conditions were told to the board and committees they were amazed that the actual conditions existed. Too much dependence in the past had been put on the former treasurer and office manager in keeping the board properly informed. * * * It was practically impossible to interpret any entries in the journal and cash record and the general ledger had been used for both journal and general ledger in numerous instances. The only records maintained for the general ledger were some plain cards, about the size of the machine posting cards, which were kept in the office manager's desk. She was very reluctant to produce them. The above conditions were brought to the attention of the new treasurer who promised prompt action in getting the

records straight. The new treasurer will likely see that the accounting manual is observed as he is a procedure man and believes in living up to it. The entire board of directors operate their office by procedure and were somewhat surprised that the procedures of the credit union had been ignored by the office manager and former treasurer. A follow-up is necessary at close intervals to determine that the cash is being properly accounted for and that procedure is being maintained. Assistance to the new treasurer will be rendered as necessary to get him operating in the proper manner. It may be necessary to recommend removal of the present office manager if any more cash differences occur."

Malone testified that he thought Rodgers' report to the credit union was "the same old stuff". One of the officials was so fatuous that he testified he thought Rodgers had given the credit union a clean bill of health.

The letter from the Bureau enclosing Rodgers' report of examination, together with his comments and criticisms, included the following paragraphs:

"This report indicates serious deviations from approved Federal Credit Union accounting procedures and sound business practices. Following a thorough review and discussion of the report as referred to above it is requested that this office be furnished with a copy of the minutes of the meeting. Also, we request information from the supervisory committee concerning its progress in verification of all accounts be furnished periodically until this important task is completed.

"We trust that the minutes requested and the first report on the verification program can be furnished within the next thirty days.

"This office is anxious to assist you whenever possible and inquiries concerning the report or operations of the credit union are invited."

Rodgers returned on March 24, 1952, and found the cash in balance. He returned a couple of months later but did not check the cash, apparently because he was pressed for time, and submitted a follow-up report to his supervisor, who characterized it as entirely inadequate. Nevertheless, nothing further was done by the Bureau or the credit union until March, 1953, except (1) an exchange of letters between the credit union and the Bureau, in which the Bureau emphasized that it insisted upon the journal and cash record being properly kept and was unwilling to make its check from the tapes of the bookkeeping machine; and (2) that Rodgers met Malone, the president of the credit union, at a credit union function in October, 1952, and told him: "I don't believe everything in that office is quite right" and "I don't entirely trust that office manager of yours." Malone testified that he was amazed at this statement, although I find as a fact that he had no reason for such amazement in view of the repeated criticism of her bookkeeping methods, culminating in the report of the apparent cash shortage on March 4, 1952, and Rodgers' oral and written report to the Board later in March, 1952.

On February 16, 1953, examiner Davis appeared. He found a discrepancy of about $600 between the total of members' ledger cards and the corresponding general ledger account. When he questioned Mrs. Ringrose about this, she gave him a demonstrably false explanation. This, together with her failure to give him a satisfactory explanation of the many changes on the take-off cards, put Davis very much on his guard; so he got in touch with Allen, the Chief of Division of Field Operations, who authorized him to make a complete audit for the month of December, 1952, something Davis had never done in an ordinary examination. While he was doing this work a package of collectors' reports and collections from the Wilkes-Barre office of the credit union was delivered, which Davis impounded and opened, a thing he had never done before. A check of these reports against the members' ledger cards in the cabinet revealed that

certain members' cards were not there. When he asked Mrs. Ringrose for these cards, she said that they were missing. The next day she did not appear and the missing cards have never been discovered. Davis was given authority to make a detailed audit and determined that there was a shortage of $395,196.96 (including dividends credited) on the basis of information developed during the examination. The testimony is uncontradicted that the loss was entirely in the members' share accounts and that there was no discrepancy in the loan accounts.

### Negligence and Contributory Negligence

There are few reported cases which are helpful in deciding these questions. There are no cases dealing with the responsibility of the government for the alleged negligence of its examiners, and few American cases dealing with the responsibility of independent accountants for negligence in making an audit. Most British cases turn upon the fact that under the English Companies Act the accountant is held to be an officer of the corporation, and is responsible as such to the stockholders. The leading American cases, Craig v. Anyon, 212 App.Div. 55, 208 N.Y.S. 259, affirmed without opinion 242 N.Y. 569, 152 N.E. 431; National Surety Corp. v. Lybrand, 256 App. Div. 226, 9 N.Y.S.2d 554; Maryland Casualty Co. v. Cook, D.C.E.D.Mich., 35 F.Supp. 160; Dantzler Lumber & Export Co. v. Columbia Casualty Co., 115 Fla. 541, 156 So. 116, 95 A.L.R. 258, and O'Neill v. Atlas Automobile Finance Corp., 139 Pa.Super. 346, 11 A.2d 782, hold that the obligation of the accountant is determined by his contract, and that he must exercise reasonable care and skill to perform his undertaking. These principles are similar to those applied by the Maryland Court of Appeals in cases involving lawyers, doctors and other professional men, e. g. Cochrane v. Little, 71 Md. 323, 18 A. 698; Kendall v. Rogers, 181 Md. 606, 31 A.2d 312.

An accountant's undertaking may be to make a cash audit, a balance sheet audit, a detailed audit, or some other type of audit or examination. It may be made for the specific purpose of detecting suspected defalcations. If the contract does not so provide, that is not a primary purpose. Levy, *Accountants' Legal Responsibility*, p. 13, cited above. The same authority states, p. 6:

"The accountant's responsibility is for the expression of a professional opinion in accordance with generally accepted accounting principles as the result of an examination conducted in accordance with generally accepted auditing standards. The accountant does *not* make factual representations as to the content of financial statements; that is the function of management. He does *not* insure, guarantee, or warrant the accuracy of management's representations, which in turn include matters of estimate, judgment and opinion."

One reason there have been so few American suits against accountants is indicated by Levy, pp. 27, 28, where he notes that it has become increasingly clear to the business community and to surety companies that while an audit offers a large measure of protection as a preventive of loss resulting from defalcations, the accountant does not undertake to uncover all such irregularities, and does not assume the responsibility of an insurer. This is the function of the surety company and generally it is recognized as such by all parties involved. He refers to an agreement between the American Institute of Accountants and many of the companies issuing fidelity bonds, by the terms of which the surety companies agreed that it was not their intention to assert claims against accountants, except on the basis of affirmatively dishonest or criminal acts or gross negligence on the part of the accountants. It was stipulated that prior to asserting such claim, the matter would be submitted to an impartial committee and that no claim would be asserted unless the committee concluded

that the claim involved an affirmatively dishonest or criminal act or gross negligence on the part of the auditor. The Federal Credit Union Act contemplates the bonding of employees. 12 U.S.C.A. § 1761(c).

Claims by clients against accountants have been made on the basis of breach of contract, negligence, breach of warranty in specific representations in the report, and fraud in the alleged misrepresentation of material facts in the reports. In actions by third parties, with whom the accountants had no contractual relation, accountants have been held not liable for ordinary negligence but only liable for fraud, reckless misstatements or insincere profession of an opinion. Ultramares Corporation v. Touche, 229 App.Div. 581, 243 N.Y.S. 179, reversed 225 N.Y. 170, 174 N.E. 441, 74 A.L.R. 1139. Claims based on misrepresentation are not permitted under the Federal Tort Claims Act. 28 U.S.C.A. § 2680(h).

Plaintiffs called as expert witnesses Maurice E. Peloubet, C. P. A., of New York, and Louis A. Judges, C. P. A., of Baltimore. These witnesses testified that in their opinion the examiners and their supervisors were negligent in not recognizing such red flags as the attempts of Mrs. Ringrose to postpone the examinations, her reluctance to produce records, her failure to share work with others, their inability to reconcile the money received with the deposits made, the generally bad condition of the books, the $10.71 error found by Cowart in 1951 and the $1,208.24 apparent cash shortage found by Rodgers in 1952. Plaintiffs' experts contend that the examiners should have made a greater use of the element of surprise, should have impounded the incoming cash and mail, should have taken possession and control of the records, and performed some of the work themselves for a day or two, should have made a more extensive check of the general ledger, should have checked the tapes of the posting and control machine, should have made more critical examination of the ledger cards and of the journal and cash record, should have verified some of the members' passbooks with the ledger accounts, and generally should have made a more detailed audit in view of the absence of adequate internal control.

■ These criticisims were made from the point of view of certified public accountants stating what would be required of such accountants making the type of audit which they customarily make for a bank or a building association. Neither Peloubet nor Judges had ever examined a credit union. Judges testified that in the examination of the smallest banks his firm would use at least six accountants for the first two days and continue with a smaller number for several days thereafter. In contrast, the Bureau examiners usually went alone to the credit unions. Each examiner was required to examine about 50 credit unions a year, because of the limitation on the number of examiners imposed by the budget as passed by Congress. If this was negligence on the part of the government, it was not actionable under the Federal Tort Claims Act.

Plaintiffs' experts applied too high standards in judging the performance of the examiners. They applied standards applicable to the major leagues, whereas, because of the salary limitations imposed by the budget, minor league standards would be more appropriate. Many of the really competent accountants who were employed from time to time as examiners quickly found better paying jobs in the government or elsewhere. Even the best shortstop does not field successfully every ball that is hit in his direction. A player is not charged with an error unless he gets his hands on a ball which a player in his league is supposed to be able to handle.

The government has moved to strike the testimony of Peloubet and Judges, contending that their testimony was based on procedures and standards applicable to audits by independent certified public accountants, and that there is no basis in fact or law for holding that

such procedures and standards are the measure of the government's liability in this case.

The Bureau issued to its examiners an examiner's guide which set out the objectives and procedures to be followed. The objectives of a Bureau examination are different from those of the usual audit by certified public accountants, but the procedures which the examiner's guide calls for are substantially what would be generally regarded as sound accounting practices.

In the case at bar the red flags were there, in increasing numbers from year to year. The examiners and their supervisors were slow to recognize them, and to adapt their examinations to the conditions which they found. But the examiner's guide necessarily left a good deal to the discretion of the individual examiners, and the supervisors had to determine how much, if any, detailed auditing should be done by the examiners and how much should be left to the credit union officials. The reports of the examinations which were sent to the credit union, the transmittal letters which accompanied them, and the oral statements of the examiners to the officers individually and at the meetings held after each examination called most of the red flags to the attention of the credit union officials, although not always as clearly and forcefully as they might have done. However, the question whether there was any negligence which does not come within the discretionary function exemption either in the examinations or in reporting what was found, must be determined in the light of the fact that the statute placed the responsibility for keeping records, making audits and verifying passbooks on the officials of the credit union and not on the government examiners.

None of the examinations would have been sufficient if the Bureau had undertaken to make such an audit as independent auditors are usually employed to make. But that was not the purpose of the Bureau's examination, and the government did not assume any such duty.

■ I conclude that the motion to strike the testimony of Peloubet and Judges is too broad, and must be denied; but the acts and omissions of the examiners must be judged by standards different from those applied by those witnesses.

The government has moved to strike plaintiffs' exhibit 70, a 147-page transcript of a meeting of the members of the plaintiff credit union held on June 13, 1953, three months after the shortage was discovered. It makes little difference whether the motion is granted or refused, (1) because none of the representatives of the Bureau had authority to make at that time any admissions which would be binding on the government; (2) because I do not believe the self-serving and exculpatory statements of the officers of the credit union, made at that time and on the witness stand; and (3) because even if true, those statements would be entirely insufficient to relieve the credit union of the negligence of its officers, directors and supervisory committee members. All other motions to strike testimony and other evidence, made by either plaintiffs or defendant and not heretofore ruled on, are denied.

■ Judged by properly applicable standards, I find that Gahan, Hallissey and Cowart were not negligent in making their examinations in 1947, 1948, 1949 and 1951. They did not do everything the examiner's guide suggested, but the guide imposed impracticable, if not impossible, standards for a single examiner. Cowart reported to his supervisor the discrepancy of $10.71 which he found, and the supervisor made the decision that Cowart should not make a detailed audit, but that the officials of the credit union should do the work. On hindsight, this was a bad decision, in view of the past record of the failure of the officials to do their duty, and of the failure of the supervisor to set out the importance of the matter in words of

one syllable in his transmittal letter. The evidence with respect to what the credit union did about the $10.71 is confusing. It is a close question whether the supervisor was negligent, and another close question whether his acts or omissions were at the "operational level" or whether they come within the discretionary function exception. 28 U. S.C.A. § 2680(a); Dalehite v. United States, 346 U.S. 15, 73 S.Ct. 956, 97 L. Ed. 1427; Somerset Seafood Co. v. United States, 4 Cir., 193 F.2d 631; Eastern Air Lines v. Union Trust Co., 95 U.S.App.D.C. 189, 221 F.2d 62, affirmed without opinion on Dec. 5, 1955, 350 U.S. 907, 76 S.Ct. 192; Dishman v. United States, D.C.Md., 93 F.Supp. 567. On balance I find that plaintiffs have not met the burden of proving actionable negligence in connection with the examinations before 1952.

In 1952 the government clearly failed to follow generally accepted auditing standards. An apparent shortage of $1,208.24 was discovered; the government admits the Bureau made a mistake in not making a detailed audit at that time, but claims that the mistake comes within the discretionary function exception. It is difficult to apportion the blame among the examiners, the regional representative and the Chief of Division of Field Operations. It is also difficult to draw the line above which the discretionary exception applies. But I conclude that if for any reason the government owed plaintiff credit union any duty to make an audit which can be made the basis of a claim under the Tort Claims Act, there were negligent acts or omissions by employees of the government at the time of the 1952 audit which do not come within the discretionary function exception.

■ I have already found that the statute imposed no such duty on the government, and that the government formally assumed no such duty. Now, after careful consideration of the statute, the Handbook, the Supervisory Committee Manual, the charter, the by-laws, the examiner's guide, the language of the certificates and the other contents of the reports, and the correspondence and conversations between representatives of the Bureau and officials of the plaintiff credit union, I find that the Bureau examinations and the reports of examination furnished by the Bureau did not amount to a trap which was reasonably calculated to lure the officers, directors and supervisory committee into a complete disregard of their duties.

■■ The negligence of the President, the Treasurer, the Directors and the Supervisory Committee of plaintiff credit union is so obvious from the statement of facts above, that this opinion need not be prolonged to list the many instances. Plaintiffs' counsel do not deny the negligence of the officials, but contend that it was induced by their reliance on the examinations made by the Bureau. I find both that they had no right so to rely, and that, in fact, they did not so rely. The reports of examination and the correspondence, which are summarized briefly under the heading "Facts", above, do not indicate that the Bureau was assuming the duties imposed on the officials; on the contrary, the Bureau repeatedly called to the attention of the officials their various responsibilities and many of the ways in which the officials were ignoring them. And, far from relying on the examiners, the officials of plaintiff credit union repeatedly objected to their suggestions, ignored their instructions, and generally placed their confidence not in the Bureau but in Mrs. Ringrose, whom they represented to the Bureau as a person to be trusted. If for no other reason, plaintiffs' claim must be denied because of the negligence of its officers, directors and supervisory committee, which made it difficult for the examiners to do their job properly, and which continued over the years down to the day the defalcations were discovered. Craig v. Anyon, 212 App.Div. 55, 208 N.Y.S. 259, affirmed without opinion 242 N.Y. 569, 152 N.E. 431; National Surety Corp. v. Lybrand, 256 App.Div. 226, 9 N.Y.S.2d 554.

It is still true that "if the blind lead the blind, both shall fall into the ditch". In this case the law placed certain duties on the guides, and other duties on the guided. The government has waived sovereign immunity with respect to particular types of claims; it has not assumed the role of an over-indulgent uncle who will always rescue his nephews from the results of their own folly or misfortune. Plaintiffs have not proved the violation of any duty owed by the government to the plaintiff credit union; on the other hand, the contributory negligence of the plaintiff credit union has been clearly proved.

These conclusions make it unnecessary to deal with the question of limitations. Counsel for both sides are to be complimented on the fairness and skill with which they summarized the voluminous testimony and exhibits and briefed the troublesome legal questions involved in the case.

Let judgment be entered for the defendant, with costs.