NATIONAL SURETY CORPORATION, Appellant, *v.* WILLIAM M. LYBRAND and Others, Respondents.

First Department, February 3, 1939.

Leo T. Kissam of counsel [J. Francis Hayden and Henry W. Nichols with him on the brief; Kissam, Murray & Hayden, attorneys], for the appellant.

Isidor J. Kresel of counsel [Bernard Hershkopf with him on the brief; Duncan & Mount, attorneys], for the respondents Lybrand, Ross Bros. & Montgomery.

George B. Brooks of counsel [Jackson, Fuller, Nash & Brophy, attorneys], for the respondent George R. Bowden.

Alfred Ogden of counsel [Dunnington, Bartholow & Miller, attorneys], for the respondent McHeffey & McDonough.

UNTERMYER, J.  The plaintiff surety company maintains this action against three firms of certified public accountants for their failure to discover and report substantial cash shortages after auditing and examining the books and accounts of Halle & Stieglitz, members of the New York Stock Exchange.  One Wallach, cashier in the main office of Halle & Stieglitz, confessed on May 2, 1934, to defalcations over a period of years aggregating $329,300.  The plaintiff, surety on a fidelity bond, paid the loss to Halle & Stieglitz and now sues as its assignee.

During the period involved Halle & Stieglitz maintained about twenty-seven bank accounts, nine of which were in New York city. It had over 2,500 customers' accounts, a large volume of daily

transactions and substantial bank loans. Many of the firm's records were kept in the " cage " of which Wallach, the cashier, had complete charge. Wallach determined when and in what amounts to transfer funds from one bank to another.

His system of embezzlements from about 1925 to May, 1934, consisted of a series of abstractions from petty cash. The ever-accumulating shortage of cash in banks was concealed by delaying and substituting bank deposits from day to day, and, when outside audits were made, by " kiting " checks from one bank to another on the audit date. The effect was that the sums covered thereby appeared in two banks at the same time. This " lapping " or " kiting " practice resulted in a credit at the payee bank on the same day that the check was deposited, making up a shortage previously existing there, while the amount would not be debited at the drawee bank until at least a day thereafter. Wallach knew when audits were to be made and, by the use of this system, effectually concealed his steadily-increasing thefts for several years.

Defendant George R. Bowden & Company (referred to as Bowden) examined the books of Halle & Stieglitz as of January 31, 1928, at which time the cash shortage amounted to $28,350. Wallach's subsequent thefts amounted to $300,950.

Defendants Lybrand, Ross Bros. & Montgomery (referred to as Lybrand) made examinations as of September 30, 1929, September 30, 1930, October 31, 1931, and September 30, 1932. The shortages existing at and arising after those various audit dates were as follows:

| Date | Shortage | Subsequent thefts |
|---|---|---|
| Sept. 30, 1929 | $123,328 50 | $205,971 50 |
| Sept. 30, 1930 | 197,000 00 | 132,300 00 |
| Oct. 31, 1931 | 245,000 00 | 84,300 00 |
| Sept. 30, 1932 | 273,000 00 | 56,300 00 |

Defendant McHeffey & McDonough made an examination as of November 30, 1933. The shortage then amounted to $315,000. Wallach's thefts between that date and the date of his confession in the first week of May, 1934, amounted to $14,300. In all, his peculations aggregated $329,300.

Lybrand had made an earlier examination in 1926, as had Bowden in 1927, but causes of action thereon were withdrawn as within the Statute of Limitations.

The defendants are charged with failure properly to perform their contracts to audit, with breach of warranty in their reports, with negligence in their work, and with fraudulently misrepresenting material facts in their reports as to the financial condition of Halle

& Stieglitz. It is claimed that if the defendants had discovered and reported Wallach's misappropriations, Halle & Stieglitz would not have continued him in their employ or sustained the subsequent losses. It is also claimed that they might then have recovered previous losses from Wallach.

The defendants Lybrand deny the material allegations of the complaint and assert that Halle & Stieglitz knew or should have known of Wallach's dishonesty but failed to advise the defendants of it; that the proximate cause of the loss was the contributory negligence of Halle & Stieglitz; that the damage was not attributable to any reasonable reliance on the acts or omissions of these defendants; and that the defalcations and damages were not within the contemplation of the parties to the contracts. Bowden's answer contains the same defenses, while that of McHeffey & McDonough interposes only denials.

The trial court concluded that the plaintiff failed to make out a case for submission to the jury. The first question is whether there were circumstances which should have put the defendants on their guard so that they, as professional accountants, might have ascertained the true situation in the course of their investigations.

It was Wallach's practice usually to take the " kiting " checks from the check books of the firm, but out of numerical order, so that the stubs pertaining to the checks would appear beyond the last stub regularly dated for the month. Then, when the check stubs for the previous months were totaled in the check books the " kited " checks would not be included in the footings for that month.

The circumstances surrounding " late " deposits are significant in that the deposit was often constituted differently than reflected in the books of the firm. For example, the deposit book would disclose the deposit of several individual items, and although the total sum would be deposited in the bank it would consist of a different number of checks in different amounts and usually drawn by different makers. This practice developed because it was a part of Wallach's system to place a customer's check in the petty cash box, instead of immediately depositing it, then extract from the petty cash the amount of that check in cash, and deposit the check in the bank one or more days later. The accumulating shortage in that bank would then be covered by the deposit of a check or checks drawn on another of the firm's banks for the amount necessary to conceal the shortage. At times Wallach would make up the aggregate of the shortage by depositing his own check along with the checks of others.

The difference between the items on deposit slips and the entries in the deposit books was never observed. The bookkeeping

department of Halle & Stieglitz is blamed by the defendants for allowing this to remain unnoticed and unchallenged. Yet these accountants themselves apparently never undertook to examine the deposit slips, which were retained by the several banks, nor to obtain duplicates thereof.

Another office custom of Halle & Stieglitz is criticized by the defendants. Memoranda were prepared in pencil by the bookkeeping department intended to show daily bank balances or the cash totals which the firm was supposed to have in banks. These memoranda would be given to Wallach, who would change the amounts so as to reflect approximately the actual amount of cash in banks. However, these slips were not permanent records. They were information memoranda used solely for the consideration of bank loans. As they were immediately destroyed they could not have been the basis for a check-up of cash shortages. The defendants otherwise charge Halle & Stieglitz with carelessness in the conduct of their bookkeeping department, but there is no evidence that this firm differed in its office practice from that of other Wall Street brokers or that the defendants ever made any suggestions relating thereto.

During the years of Wallach's pilferings one or the other of the defendant firms of certified public accountants was employed by Halle & Stieglitz to make audits which included the verification of cash. For the audit of January 31, 1928, Bowen received fees of $2,800. He specifically reported to Halle & Stieglitz that they had on that date a balance in Guaranty Trust Company of $73,109.20 and in Hanover National Bank of $185,708.17, when in fact the balances were $72,829.20 and $157,638.17, respectively. The shortages in those two bank accounts, aggregating $28,350, were concealed by delayed deposits recorded January 31, 1928, but actually made February first with substituted items.

Djorup, plaintiff's expert, testified that comparison of the bank statements and the deposit books showed a number of delayed deposits between January 14, 1928, and February 4, 1928. The late deposits, before and after the audit date, range as high as $33,684.70, with delays varying from one to three business days. With respect to late deposits, this witness testified that he would have checked the larger items among them by obtaining the deposit slips. It is apparent that inquiries at the time of audit might have revealed the shortages.

Bowden, who rested his case without proof, contends* that he did not undertake to verify the bank accounts. His report indicates no such limitation. On the contrary, his balance sheet clearly separates cash in banks and on hand and cash borrowed from

customers' accounts. It contains the various bank balances, and cash in banks is listed among assets as amounting to $522,719.69. Even if the words " verify " and " verification " are not used, the fact of verification follows from the specific statement of the balances and total cash.

The Lybrand firm, in contrast to Bowden, concedes that their engagements for the 1929, 1930, 1931 and 1932 audits included the verification of cash. The arrangements for the 1929 and 1930 examinations were in writing, it being stated that the examination was to be " along the lines followed by us in prior audits of your accounts " and would embrace " the *verification of cash*, securities, customers' accounts, etc., without verification of income and expense accounts or the preparation of the questionnaire of the New York Stock Exchange." The arrangements for the 1931 and 1932 examinations were oral and followed the scope of the two previous years. For the four years involved, 1929 to 1932, inclusive, Lybrand received fees of $11,000. $5,000, $2,850 and $2,400 respectively.

The cash shortage on September 30, 1929, amounting to $123,328.50, was concealed by four checks in the amounts of $13,000, $10,000, $100,000 and $328.50. The first three of these checks were taken from the stubs of October first. All were deposited October 1, 1929, to take the place of a deposit of same amount, though of different items, recorded in the books on September thirtieth.

The shortage on September 30, 1930, of $197,000 was concealed by two checks for $102,000 and $95,000, which were drawn from stubs of October first, but deposited in the Guaranty Trust Company on September thirtieth.

On October 31, 1931, the shortage amounted to $245,000. The method of concealment was a deposit of $245,023.11 recorded October thirtieth and actually made October thirty-first with substituted items, including two checks for $120,000 and $125,000, respectively, which were drawn from stubs of November 2, 1931.

On September 30, 1932, with intervening defalcations of $28,000, the shortage had increased to $273,000. It was concealed by two checks of Halle & Stieglitz for $138,000 and $135,000 drawn on National City Bank and Commercial National Bank, respectively, representing the exact amount of the shortage. They had been taken out of numerical order from check stubs which were later dated October 3, 1932, and were deposited in Guaranty Trust Company on September 30, 1932.

Throughout these years there were continual lapped and delayed deposits, and instances of substitution of deposited items. These,

plaintiff insists, are well-known danger signals to skilled auditors, but were disregarded or not recognized by the defendants, who never requested duplicate deposit slips, never pointed out late deposits or bank transfers, nor made any suggestion to Halle & Stieglitz as to their methods relative to cash, yet charge Halle & Stieglitz with negligence in the failure to make investigations which are within the ordinary realm of professional accountants. The defendants say Halle & Stieglitz were negligent in failing to observe the differences between the details of the deposits actually made and those recorded in the books during the periods when Halle & Stieglitz made their reconciliations of bank accounts. The employees of Halle & Stieglitz who made such reconciliations were not auditors skilled in their profession, and their methods were purely mechanical checking to arrive at an arithmetical balance. The defendants' employment, however, was the verification of the sums then actually on deposit in the banks.

Aside from accepting the engagement and reviewing the report, the Lybrand partners did not participate in the audits. Their employees were supervised by a senior accountant who made assignments and gave instructions. The only Lybrand employee who " verified " the cash in banks was the witness Brushaber, who was called by the plaintiff. Brushaber had not listed " Transfers between banks " on previous audits, but he made such a list during the period covered by his reconciliation in 1932 and was examined in connection therewith. However, even after compiling such a list, Lybrand's employee either disregarded the very items which had become Wallach's expedient in concealing his defalcations or did not understand their significance. The plaintiff asserts that the procedure followed was mere mechanical routine, with no attempt to guard against the use of checks drawn from the check book out of numerical order and beyond the last check of the current month; that no notice was taken of delayed deposits nor effort made to guard against " lapped " deposits or " kited " checks; that Brushaber did nothing on the audit dates to ascertain the last checks drawn by Halle & Stieglitz for the previous month.

For the audit of November 30, 1933, McHeffey & McDonough received fees of $2,000. The shortage had then reached the sum of $315,000 and was concealed by two checks for $150,000 and $165,000 drawn on National City Bank and Commercial National Bank, respectively, the total covering the exact amount of cash defalcations to that date. These two checks were taken from the stubs of December first, but were deposited in the Guaranty Trust Company on November twenty-ninth, the deposits being recorded as made on December first.

On May 3, 1934, after Wallach had confessed his thefts, McHeffey & McDonough were employed to verify the defalcations and later submitted a detailed report showing the accumulation of the loss over a period of years. The account with Guaranty Trust Company was then short a total of $329,300.

In a letter written by defendant McHeffey & McDonough on November 8, 1933, they stated that " the details of our audit will include: * * * 6. Verification of Bank Balances." They contend that their report is distinguished from the report of the other defendants in that there was no delayed deposit on the audit date. The plaintiff concedes that there was no delayed deposit between November 29 and December 1, 1933, but there was a deposit of the two " kited " checks of $150,000 and $165,000, above referred to, for which no entry appeared in the deposit book. The only items corresponding in amount were entered on December first. Furthermore, there are instances of substantial delayed deposits in the latter part of November, 1933, and later, investigation of any of which would have disclosed that the shortage was then being concealed by " lapping."

McHeffey & McDonough also contend that they are exonerated because, notwithstanding the shortage, Halle & Stieglitz retained them to verify the amount of defalcations and to prepare a claim against the surety. The subsequent employment, however, did not condone any prior negligence of these defendants. The purpose was solely to verify the shortage and fix the dates of its occurrence. Except for the expert Klein, who was called by Lybrand, the defendants " rested without calling any witnesses, although there would naturally be available the men who made the audit, those who prepared or supervised the preparation of the working papers or the certified balance sheet and experts to refute the testimony offered by the experts called by plaintiff." (*State Street Trust Co.* v. *Ernst*, 278 N. Y. 104, 111.)

It is contended that the defendants' engagements called for only partial examinations, of limited scope and nature, and that the fees were fixed accordingly. Conceding that the audits and examinations were limited in scope, the loss here did not involve bank loans, customers' accounts, partners' accounts, expense accounts or other liabilities. It resulted from a shortage of cash in banks due to pilferings of petty cash. The question, then, is whether the defendants' duty was performed by a mere book reconciliation of cash or whether it did not require the ascertainment of the actual cash in bank.

It is undisputed that cash in bank · can be verified absolutely. The contracts for the services of the defendants were plain and

their engagements required the exercise of reasonable skill and diligence in making an actual determination of the cash position of Halle & Stieglitz and not a mere arithmetical bookkeeping computation. When they accepted the employment, though it may be at a low rate of compensation, they assumed the risk of non-performance of contracts contemplating actual verification of cash in banks.

To "verify," as defined in Corpus Juris, volume 67, page 230, is to "ascertain to be correct; * * * to confirm or establish the truth of." In Dicksee's Manual on Auditing (Am. ed. 1909), edited by Robert H. Montgomery, one of the defendants herein, it is said (p. 40): "A list of cheques outstanding should be retained, and it should be ascertained afterwards, either by a second writing up of the pass book or by inquiry of the bank, whether the amounts agree. If the time of the proposed audit is known, fraud may easily be committed and the cash inflated by drawing a cheque at the last moment which will be 'outstanding.' "

In Montgomery's own treatise on "Auditing — Theory and Practice" (1912), he says (p. 94): "When the cash balance consists of several bank accounts or funds, care must be taken to see that the entire balance is verified simultaneously. Instances are known where auditors have been deceived through one balance, after being inspected, having been transferred and used on a later day in connection with another balance."

Safeguards against fraud are discussed in Bell and Powelson on Auditing (1932), at page 71:

"The reason for thus testing individual deposits, and especially the composition thereof, is to detect any evidence of temporary misappropriations of cash which have been restored, or of the somewhat similar form of fraud known as 'kiting,' which involves a series of unauthorized 'borrowings,' one being used to repay the other. * * *

"When there is more than one bank account, a test should always be made of deposits during the last days of the audit period. The particular purpose of this is to detect a deposit in one bank of an unrecorded check on another bank to conceal a shortage in the first bank, which check cannot reach the second bank in time to be charged by it in the audit period and will not appear as outstanding."

And (at p. 73) it is said: "For the same reason that all checks supposed to have been issued should be accounted for, it is necessary, so far as practicable, to determine that none have been issued which were not supposed to have been. Knowing that all current numbers of checks would be accounted for by the auditor, the

person desiring to issue a fraudulent check would be likely to use one that was not current. For that reason, the auditor should see that no checks have been abstracted from the back of the check book, if they are in book form."

The extent of an accountant's duty is well defined in *Matter of London & General Bank* (L. R. [1895] 2 Ch. 673, 682). Not only must he examine the books but, if that be his contract, he must satisfy himself with reasonable diligence that the books " show the true financial position of the company."

The evidence in this case discloses similar conditions at the time of all the audits in question. It was for the jury to say whether the practice of " lapping " and " kiting " of checks should have put the defendants upon inquiry which would have led to discovery of the defalcations, and whether, if defendants had exercised ordinary care and used proper methods of accounting as established by the expert testimony, they would have observed checks drawn out of numerical order. If they had checked " outstandings " they would have noted that the check or checks used by Wallach at the audit dates were returned with the canceled vouchers accompanying the next bank statement. Again, if there had been any substantial compliance with the requirements for verifying cash in banks the cash shortages would have been .detected, as the jury might have found. Their representations that there had been a verification of cash was a pretense of knowledge when they did not know the condition of the bank accounts and had no reasonable basis to assume that they did. This, the jury could have found, amounted at least to a constructive fraud. (*Ultramares Corp.* v. *Touche*, 255 N. Y. 170, 190, 191; *State Street Trust Co.* v. *Ernst*, *supra*, p. 112.)

The defendants assert that they are not liable, no matter how negligent they may have been, because Halle & Stieglitz were guilty of contributory negligence. If it be true that Halle & Stieglitz so conducted their business as to make possible Wallach's defalcations, it did not necessarily excuse the defendants from the consequences of their negligence in failing to discover and report the facts. The action here, it must be remembered, is not to recover for the thefts committed by Wallach as it would be if it were against Wallach or against the surety. The action is for errors of the accountants in failing to discover Wallach's defalcations, thereby making further defalcations possible and rendering more difficult recovery for defalcations of the past. The measure of damages in two such classes of actions is not the same.

We are, therefore, not prepared to admit that accountants are immune from the consequences of their negligence because those

who employ them have conducted their own business negligently. The situation in this respect is not unlike that of a workman injured by a dangerous condition which he has been employed to rectify. (*Kowalsky* v. *Conreco Company*, 264 N. Y. 125.) Accountants, as we know, are commonly employed for the very purpose of detecting defalcations which the employer's negligence has made possible. Accordingly, we see no reason to hold that the accountant is not liable to his employer in such cases. Negligence of the employer is a defense only when it has contributed to the accountant's failure to perform his contract and to report the truth. Thus, by way of illustration, if it were found that the members of the firm of Halle & Stieglitz had been negligent in connection with the transfer of funds which occurred at about the time of each audit and that such negligence contributed to the defendants' false reports, it would be a defense to the action, for it could then be said that the defendants' failure to perform their contracts was attributable, in part, at least, to the negligent conduct of the firm. That was the principle applied in *Craig* v. *Anyon* (212 App. Div. 55; affd., 242 N. Y. 569) where the embezzler had been negligently represented to the accountants as a person to be trusted. In the present case the loss consisted of thefts by a cashier not so represented " whose own account of his receipts and payments could not reasonably be taken by an auditor without further inquiry." (*Matter of Kingston Cotton Mill Co.* [*No. 2*], L. R. [1896] 2 Ch. Div. 279.)

We are, therefore, of opinion that the plaintiff established a *prima facie* case. The question of the defendants' liability on the various theories set forth in the complaint should have been submitted to the jury. It was also for the jury to say whether the defendants were liable for defalcations subsequent to their audits, depending upon whether such losses could reasonably have been anticipated at the time they were engaged in the performance of the work. (*Critten* v. *Chemical National Bank*, 171 N. Y. 219; *Smith* v. *London Assurance Corp.*, 109 App. Div. 882.)

It may be prudent, though perhaps unnecessary, to say that we have stated the facts as they might have been found if the case had been submitted to the jury. We do this because, the complaint having been dismissed, the plaintiff is entitled to the most favorable inferences fairly to be drawn from the evidence. We do not intend to suggest that the facts, as we have stated them, would have been accepted by the jury or that upon a new trial other facts may not appear. We merely hold that on the present record the issues of fact, including negligence and contributory negligence, were for the jury.

The judgment should be reversed and a new trial granted, with costs to the appellant to abide the event.

GLENNON and CALLAHAN, JJ., concur; MARTIN, P. J., and DORE, J., dissent and vote to affirm.

Judgment reversed and a new trial ordered, with costs to the appellant to abide the event.