STEINER CORPORATION, a Nevada Corporation, Carol S. McCormick, Administrator of the Steiner Corporation Retirement Plan, and Steiner Corporation Retirement Plan, Plaintiffs,

v.

JOHNSON & HIGGINS OF CALIFORNIA, a California corporation, Donald F. Reeves, and Roy J. Bertoldo, Defendants.

No. 88–CV–410 G.

United States District Court,
D. Utah,
Central Division.

Sept. 28, 2000.

P. Bruce Badger, Jay B. Bell, Peter W. Billings, Sr., Fabian & Clendenin, Salt Lake City, UT, Randy K. Johnson, Mackey Price & Williams, Salt Lake City, UT, for Steiner Corp Carol S. McCormick, Steiner Corporation Retirement Plan.

David A. Greenwood, Van Cott Bagley Cornwall McCarthy, Salt Lake City, UT, John Edward Hurley, Kirstie A. McCornock, Christine Banks, McCutchen Doyle Brown & Enersen, San Francisco, CA, for Donald F. Reeves, Roy J. Bertoldo.

David A. Greenwood, Van Cott Bagley Cornwall & McCarthy, Salt Lake City, UT, Kirstie A. McCornock, Christine Banks, McCutchen Doyle Brown & Enersen, San Francisco, CA, Lisa R. Petersen, Giauque Crockett Bendinger & Peterson, Salt Lake City, UT, for Johnson & Higgins of California.

## FINDINGS AND ORDER IN RE CAUSATION

J. THOMAS GREENE, District Judge.

This matter is before the court on remand by the United States Court of Appeals for the Tenth Circuit for determination of causation of injury to plaintiff Steiner Corporation ("Steiner") and the damages, if any, resulting from professional negligence by Defendant Johnson & Higgins ("J & H"). J & H was Steiner's actuary at relevant times and Donald F. Reeves and Roy J. Bertoldo were the individual members of J & H doing Steiner's work. *See Steiner Corp. v. Johnson & Higgins,* 135 F.3d 684, 694 (10th Cir.1998) ("*Steiner II* ").

The remanded issues have been fully briefed by the parties and extensive oral argument has been presented to the court. Now, being fully advised, the court enters its Findings and Order concerning those issues.

PROCEDURAL HISTORY

On January 24, 1992, after a seven day bench trial that took place in late October and early November 1991, this court rendered its decision and entered Findings of Fact and Conclusions of Law (the "Original Findings and Conclusions" or "OF & C"). In that initial decision this court addressed several claims by plaintiffs and a counterclaim by J & H. Only one matter currently remains for determination here—the issue of causation. Steiner claims that defendants' professional negligence caused Steiner to lose its opportunity to change the lump sum formula in effect for measuring retirement benefits for its employees, so as to make the lump sum the economic equivalent of the annuity which was also available to Steiner employees upon retirement.

With respect to Steiner's claim, this court found that defendants had failed, in two respects, to meet the standard of care in the actuarial community. (*See* OF & C ¶ 31, at 11–12.) However, the court concluded that Steiner had suffered no damages on account of defendants' professional negligence, in part because the liberal lump sum formula, by usage and practice over the years, had become part of the Steiner plan and so could not be changed. (*See* OF & C ¶ 45, at 17; ¶ 2, at 18.)

Steiner appealed, apparently "accept[ing] as true the factual findings of the district court." *Steiner Corp. Retirement Plan v. Johnson and Higgins,* 31 F.3d 935, 936 (10th Cir.1994), *cert. denied,* 513 U.S. 1081, 115 S.Ct. 732, 130 L.Ed.2d 635 (1995) ("*Steiner I* "). The Tenth Circuit reversed this court's determination that Steiner could not have amended its lump sum actuarial equivalency factors retroactively, even if the amendment had been accomplished prior to October 31, 1985, the deadline for making plan amendments under ERISA. In this regard, the *Steiner I* court held that "the district court erred when it held that the Layered Formula could not be amended to reduce the lump sum optional benefit at the time [Steiner] adopted the 1985 Plan." *Id.* at 942. The

case was therefore remanded for determination of causation and damages. In so doing, the *Steiner I* court stated:

> [T]he record is clear that if Mr. Steiner, who was responsible for the administration of the Plan at the critical time in question, October 31, 1985, had known that the lump sum was more valuable than the annuity, then he would have opted to change the actuarial factors to reduce the lump sum so that it was equivalent to the annuity.

*Steiner I*, 31 F.3d at 940.

On remand, this court received briefs and oral argument on the remanded issues and, on December 27, 1995, entered its Order on Remand. At that time, this court acknowledged and adopted the Tenth Circuit's assessment of the facts, stating: "In accordance with the Tenth Circuit's determination on this matter, this court finds and holds that J & H's negligence was at least a partial cause of Steiner's failure to change the actuarial formula in the Plan." (Order on Remand at 5.)[1] The court then went on to discuss Steiner's own negligence and held that recovery was barred because Steiner's own negligence was comparatively greater than that of J & H. (*See* Order on Remand at 6–8.)

Steiner again appealed and the Tenth Circuit reversed, holding that "[t]he basis for the comparative negligence finding against Steiner was wrongly grounded on Steiner's *prior* acts that had placed it in the difficulty which J & H specifically undertook to analyze and advise upon." *Steiner II*, 135 F.3d at 692 (emphasis added). The case again was remanded for determination of causation of injury and damages.

On the second remand, the parties submitted briefs on the remaining issues and, on defendants' motion, the court certified two questions to the Utah Supreme Court.[2] The Utah Supreme Court responded, holding that "a preexisting condition that a professional is called upon to resolve cannot be the cause, either proximate or direct, of the professional's failure to exercise an appropriate standard of care in fulfilling his duties." *Steiner Corp. v. Johnson & Higgins*, 996 P.2d 531, 533 (Utah 2000) ("*Steiner III*"). However, the Utah Supreme Court noted that a client could be held contributorily negligent if "[n]egligent actions by the [client] [a]re found to have *contributed to the injury*" as opposed to the condition the professional has a duty to resolve. *Id.* (emphasis added).[3] The *Steiner III* court ultimately

---

1. The court now vacates this statement, as it was premised upon the mistaken belief that the circuit court had made a preemptive factual determination on the causation issue. A careful review of the *Steiner I* opinion and thoughtful consideration of the circuit court's treatment of J & H's challenge to causation in *Steiner II* reveals that the Tenth Circuit had no intention of making any preemptive factual determination as to causation. Rather, the circuit court's remand orders in *Steiner I* and *Steiner II* make evident that the issue of causation has been left entirely open. *See Steiner I*, 31 F.3d at 941 ("[T]here still remain the issues of causation and damages; therefore, we REMAND ....."); *Steiner II*, 135 F.3d at 693 ("We conclude that the prudent course is to leave this issue of causation of injury for the district judge to address *in the first instance* on remand ....") (emphasis added). *See* Analysis of Causation Issue, *infra*.

2. As noted in the Utah Supreme Court opinion, the certified questions were: "(1) whether, under Utah law, the negligent acts of a

plaintiff in causing or contributing to the situation that the plaintiff hired a professional to resolve can be the basis for a comparative or contributory negligence defense, and (2) whether, under Utah law, a plaintiff's negligent acts in causing or contributing to the situation the plaintiff hired a professional to resolve can be considered in determining causation and damages." *Steiner III*, 996 P.2d at 531–32. The *Steiner III* court, the Supreme Court of Utah, answered both questions, "no." *See id.* at 532.

3. "Because the principles of [Utah's] tort case law provide[d] sufficient basis for [its] decision, [the Utah Supreme Court] ... d[id] not analyze or rely on [*National Surety Corp. v. Lybrand*, 256 A.D. 226, 9 N.Y.S.2d 554 (1939)]." *Steiner III*, 996 P.2d at 533. Instead, the Utah Supreme Court adhered to the general rule: "For a client to be contributorily negligent, his negligence must relate or contribute to the alleged injury caused by the professional stemming from the professional relationship." *Id.* at 532.

concluded: "The negligent acts of Steiner cited by the trial judge *preceded* the omission by J & H and therefore did not 'relate to the injury alleged to have been caused by the [professional's] negligence." *Id.* at 533–34 (quoting *Steiner II,* 135 F.3d at 693) (emphasis added).

Following issuance of the Utah Supreme Court opinion in *Steiner III,* the parties submitted additional briefs and, on April 25, 2000, this court received oral argument on the issues of causation, contributory negligence, and damages. The court also heard argument on defendants' motion to amend, by which defendants sought to add the so-called "economic loss rule" as a defense. That motion to amend is treated in a separate simultaneously released order rejecting defendants' contention that the economic loss rule precludes the possibility of any recovery for their professional negligence.

### FINDINGS IN RE CAUSATION

Both parties have agreed that because sufficient evidence is set forth in the existing record of prior proceedings, it is not necessary for the court to hold a further evidentiary hearing or to receive any additional evidence with respect to causation. (*See, e.g.,* Steiner Corporation's Brief on Second Remand at 4.) After a full review of the record, including evidence relevant to the issue of causation, this court now finds the following facts. Where noted by citation to the Original Findings and Conclusions or to the Order on Remand, these findings are simply a restatement of previously determined facts, which have neither been challenged nor disturbed in either of the two prior appeals. Otherwise, these findings supplement and, where inconsistent, supercede prior findings of fact.

1. Steiner was the architect of the layered formula which was used to compute the optional lump sum benefit for retiring Steiner employees and Steiner chose the below market discount rates incorporated into that formula. (*See* OF & C ¶ 9, at 3.)[4]

2. Steiner created the layered formula in 1958 and amended it in 1978 to add a third layer for service by employees after December 31, 1977. (*See* OF & C ¶¶ 9–10, at 3–4.)[5] In July 1986, Steiner amended the Plan to add a fourth layer to the lump sum formula for service from that date forward. (*See* OF & C ¶ 36, at 14.) This fourth layer utilized a floating market rate established by the Pension Benefit Guaranty Corporation (the "PBGC rate") to calculate the lump sum.

3. Steiner intentionally and knowingly used the historic layered formula, which incorporated below market discount rates, continuously from 1958, the date of its adoption, through July 1986. (*See* OF & C ¶¶ 11, 36, at 4, 14.)

4. In 1978 Steiner rejected J & H's advice to change the formula to calculate the lump sum on the basis of the PBGC rate. Instead, Steiner directed J & H to retain the 3½% and 4% layers and to add a third layer of 6% to the lump sum formula. Fred Kane explained that "his reason for doing that is that he felt employees had

---

4. According to the deposition testimony of Daniel Harris, which was received at trial, Fred Kane was the person who decided what discount rates to use in computing the lump sum. (*See* Deposition of Daniel Harris ("Harris Dep.") at 110.) Portions of the Harris Deposition (as well as portions of the depositions of John Hahn and Bruce Cable) were read and incorporated into the record. *See* Volume II Transcript of Trial at 328–33 (Oct. 29, 1991); Volume III Transcript of Trial at 377–79 (Oct, 30, 1991); Transcript of Trial at 10 (October 30 & 31, 1991). Per stipulation of the parties the court reporter did not transcribe the portions read into the trial transcript. Consistent with the parties' intent and stipulation, the court relies upon the parties' Joint Designation of Depositions concerning the portions of those depositions which were read into the record.

5. Daniel Harris testified, via deposition which was read during the trial, that the lump sum formula was in the plan starting in 1958, but that at that time its availability to retiring employees was at the option of Steiner. (*See* Harris Dep. at 105.) In 1975, at the direction of Fred Kane and by his decision, the Steiner plan was amended to make choice of the lump sum benefit the option of the employees rather than Steiner. (*See* Harris Dep. at 105.)

certain expectations with regard to benefits generated by the use of those two rates, 3 and a half and 4 percent, and he did not want to disappoint them in those expectations." (Volume VI, Part II Transcript of Trial at 27 (Nov. 6, 1991) ("6 Tr. pt. 2").)

5. Most employees of Steiner became aware that the lump sum was more valuable than the annuity and "[h]istorically, almost all of the retiring Steiner employees elected to take the lump sum benefit instead of the annuity. [Steiner] and [J & H] were aware of that fact." (OF & C ¶ 13, at 4; *see also* Volume I Transcript of Trial at 78, 79, 133, 147 (Oct. 28, 1991) ("1 Tr."); Volume VII Transcript of Trial at 30–31 (Nov. 7, 1991) ("7 Tr.").)

6. The lump sum benefit was more valuable than the annuity because the discount rates used to calculate the lump sum benefit were below prevailing market rates. (*See* OF & C ¶ 14, at 4–5.) The higher prevailing interest rates rose relative to the rates contained in the formula, the more valuable the lump sum benefit became in relation to the annuity. (*See* OF & C ¶ 14, at 5.)

7. Steiner knew at all times that the lump sum was more valuable than the annuity. It was apparently regarded by Steiner as a part of the compensation package for loyal past service. (*See* OF & C ¶ 34, at 13; ¶ 45, at 17.)[6] In this regard, Steiner was aware that its plan was a "cheap" plan—that is, it provided significantly less retirement income than what was being provided by other corporations

with a size and makeup similar to Steiner. (*See* 6 Tr. pt. 2 at 33.)

8. In the fall of 1976, Steiner's Chief Financial Officer, Fred Kane, and Steiner's tax manager and plan administrator, Daniel Harris, met with Roy Bertoldo of J & H to determine whether it would be appropriate to engage J & H to provide actuarial services for Steiner. (*See* 6 Tr. pt. 2 at 10.) During this first meeting, Mr. Bertoldo was informed that Steiner computed the lump sum using layered discount rates of 3½ % and 4%. (*See* 6 Tr. pt. 2 at 13–14.) Mr. Bertoldo pointed out that those rates were below current market levels. (*See* 6 Tr. pt. 2 at 14.) Mr. Bertoldo, who viewed the use of these fixed below market discount rates as a defect in the plan, also explained the potential problems of using fixed discount rates, especially when those rates were below prevailing market rates. (*See* 6 Tr. pt. 2 at 14–15.) Mr. Bertoldo explained that if such rates were used to compute the lump sum it would both provide a higher benefit—an extra windfall—to retiring employees and would be more costly to the plan. (*See* 6 Tr. pt. 2 at 15–18.) None of this appeared to be anything new to Mr. Kane or Mr. Harris and when Mr. Bertoldo recommended the use of a floating system of interest rates they gave no indication that they were interested in abandoning use of the historic layered formula to follow Mr. Bertoldo's recommendation. (*See* 6 Tr. pt. 2 at 18–19.)

9. J & H was hired in 1977 to replace William M. Mercer, Inc. as actuary for Steiner's plan. (*See* OF & C ¶ 7, at 2.)

---

**6.** The knowledge of an agent concerning matters within the scope of his agency, the control or supervision of which has been delegated to him by his principal, is the knowledge of the principal. *See Alaska S.S. Co. v. Pacific Coast Gypsum Co.*, 78 Wash. 247, 138 P. 875 (1914); *Hodges v. Gibson Prods. Co.*, 811 P.2d 151, 157 (Utah 1991) (recognizing "[t]he rule imputing a servant's knowledge to the master"); *Lowe v. April Indus.*, Inc., 531 P.2d 1297, 1299 (Utah 1974) (noting that under "the law of corporations, knowledge of the entity is imputed to it from the knowledge possessed by its officers and agents"). Thus, Steiner Corporation's knowledge that the

lump sum was more valuable than the annuity is imputed because "[i]t was known through the years by Steiner's Plan Administrator Daniel Harris [as well as by Fred Kane and other Steiner employees] that a significant or liberal differential in value existed in favor of the lump sum over the annuity." (OF & C ¶ 34, at 13.) Further, under Utah law, once a corporation is charged with notice or knowledge of a matter, such notice or knowledge continues to be imputed to the corporation notwithstanding any personnel changes. *See Microbiological Research Corp. v. Muna*, 625 P.2d 690, 695 (Utah 1981).

10. In 1977 or 1978, Roy Bertoldo, of J & H, met with Fred Kane and Daniel Harris and gave them a copy of a letter he had addressed to the financial editor of the San Francisco Chronicle in November 1977. (*See* 6 Tr. pt. 2 at 21.) The letter discussed a lump sum benefit that had been distributed to the chief executive officer of First Chicago, a lump sum that was calculated using a fixed 6% discount rate while the PBGC rate was 8%. (*See* 6 Tr. pt. 2 at 22–23; Exhibit D–21.) The letter explained that because the discount rate used to calculate the lump sum was 2% below prevailing market rates, the retiree received approximately a 12% windfall, which in his case made a difference of approximately $150,000 to $160,000. (*See* 6 Tr. pt. 2 at 22–23; Exhibit D–21.) Mr. Bertoldo explained the letter to the Steiner representatives and used it as an example to show the significance of Steiner's use of below market discount rates in computing the lump sum—how even a 2% difference between a fixed discount rate and prevailing market rates makes a significant difference. (*See* 6 Tr. pt. 2 at 22–23; 7 Tr. at 48.) Steiner knew and understood this. (*See* 6 Tr. pt. 2 at 23.)

11. J & H continuously reminded Steiner of the difference in value between the lump sum benefit and the annuity and continued to counsel Steiner to change to a floating market rate. (*See* OF & C ¶ 14, at 5.) On several occasions, J & H explained to Steiner that, as a result of the below

market discount rates that had been incorporated into the historic lump sum formula, the lump sum benefit was both more valuable to retirees and more costly to the Plan, as compared to the annuity or to a lump sum calculated using market rates. (*See* OF & C ¶ 14, at 5.) [7] These facts were well known to Steiner over the years. (*See* OF & C ¶ 14, at 5.) On several occasions, J & H recommended that Steiner abandon its historic layered formula and instead utilize a market-based interest rate to calculate the lump sum, such as the PBGC rate. (*See* OF & C ¶ 14, at 5.) [8] On November 28, 1977, J & H sent a letter to Steiner recommending that Steiner change to a floating market rate, such as the PBGC, for computing lump sums. (*See* Volume VIII Transcript of Trial at 7–8 (Nov. 8, 1991) ("8 Tr.").)

12. J & H warned Steiner that the Internal Revenue Service might challenge the lump sum benefit because of the use of below market discount rates. Notwithstanding, Steiner rejected J & H's advice to change the way the lump sum benefit was calculated and chose to retain the historic layered formula. (*See* OF & C ¶ 16, at 5–6.)

13. Steiner understood the cumulative magnitude of the discrepancy in value to retiring employees between the lump sum benefit and the annuity. (*See, e.g.,* Transcript of Trial at 26–27 (Nov. 7, 1991) (Testimony of Larry Zimpleman); Transcript of Trial at 25–31 (Nov. 12, 1991) (Testimony of Lawrence Mitchell).) Steiner maintained in its file a Schedule at-

7. Mr. Bertoldo discussed this with Fred Kane on at least four occasions in addition to the initial discussion described in paragraph 8, during face-to-face meetings at which Mr. Harris was also present. (*See* 6 Tr. pt. 2 at 20–21, 24–25.) At one of the meetings Mr. Bertoldo gave Mr. Kane a copy of a letter to the editor he had addressed to the financial editor of the San Francisco Chronicle dealing with the very issue. (*See* 6 Tr. pt. 2 at 20–21.) As discussed *supra,* this letter aptly demonstrated the potential magnitude of the discrepancy between the fixed discount rates and prevailing market rates. (*See* 6 Tr. pt. 2 at 20–21; Exhibit D–21.) Donald F. Reeves also

discussed the matter several times with Mr. Harris and, on November 28, 1977, sent a letter to Mr. Harris recommending that Steiner change the basis for computing the lump sum to the PBGC rate or some other floating market rate. (*See* Volume VIII Transcript of Trial at 7–10 (Nov. 8, 1991); Exhibit D–22.)

8. Mr. Bertoldo made this suggestion on at least five separate occasions, including the initial meeting in the fall of 1976 and Mr. Reeves suggested the change to a floating market rate in the November, 1977 letter. (*See* 6 Tr. pt. 2 at 18–19, 24–25; Exhibit D–22; 8 Tr. at 8–9.)

tached to a November 1977 letter from Don Reeves of J & H to Dan Harris of Steiner, which compared discount rates of 6% versus 7%. That, plus the tables that Steiner used to compute the 3½, 4, and 6% layers of the formula, gave Steiner the tools for understanding and measuring the cumulative magnitude of the difference between the lump sum and the annuity. (*See* 7 Tr. at 57–60, 88–89.)

14. Steiner itself calculated and paid the lump sums to its employees. (*See* OF & C ¶ 9, at 3, Volume II Transcript of Trial at 252 (Oct. 29, 1991) ("2 Tr."); 6 Tr. Pt. 2 at 13.) The formula and tables used in calculating the lump sum benefit were in the possession of Steiner at all times and Mr. Harris always used those documents in calculating the lump sum benefits. (OF & C ¶ 34, at 13.)

15. Daniel Harris was the plan administrator of Steiner's pension plan from 1967 through June 1996. (*See* OF & C ¶ 8, at 3; ¶ 23, at 8.) Among his responsibilities as plan administrator, Mr. Harris "computed benefits for persons who applied for retirement through the years. Mr. Harris dealt with J & H and gave instructions .... He reported to Mr. Kane until Mr. Kane [stepped down as CFO] for health reasons· July 1, 1984. Thereafter, he reported to Kevin Steiner who became Chief Financial Officer at that time." (OF & C ¶ 8, at 3.) While Mr. Kane stepped down as CFO on July 1, 1984, he stayed on with the company for a year, among other reasons, in case Kevin Steiner "needed help or there was some problem that would arise as Kevin Steiner tried to step into his shoes as CFO." (2 Tr. at 228.) Mr. Kane did not completely retire from his employment with Steiner Corporation until June 30, 1985. (*See* 2 Tr. at 230.)

16. Following Fred Kane's retirement as CFO and at least through March 1996, Steiner and its officers, including Kevin Steiner, relied exclusively on Mr. Harris for oversight of the Steiner pension plan and the 1984 plan amendments. (*See* 2 Tr. at 228, 245–46, 250–58; 8 Tr. at 22.) Kevin Steiner and Steiner Corporation left entirely to Mr. Harris' discretion what issues, if any, about the plan amendment to bring to Kevin Steiner's attention. (*See* 2 Tr. at 258.)

17. In February 1985, a meeting of Steiner representatives and J & H representatives was held so that Kevin Steiner, who had only recently become CFO, could meet the professionals of J & H who were doing Steiner Corporation's actuarial work. In addition to getting acquainted, the meeting was intended to provide Kevin Steiner some information and insight as to the benefits of the Steiner plan, as well as long term cost implications of the plan. (*See* 6 Tr. Pt. 2 at 55–56; 1 Tr. at 140.) In this regard, there was some discussion concerning the two options available to employees upon retirement, i.e., an annuity or a lump sum distribution, including projected liability to the corporation on the assumption that retirees were to elect the annuity versus retirees electing the lump sum. (*See* OF & C ¶ 27, at 10.)

18. All of J & H's substantive communications with Steiner from July 1984 through at least March 1996 were with Mr. Harris. (*See* 2 Tr. at 250–58; 1 Tr. at 104; 8 Tr. at 19–23.) Daniel Harris had both actual and apparent authority to give direction to J & H and to otherwise act for and on behalf of Steiner in regards to the Steiner plan and the 1984 plan amendments. (*See, e.g.,* 8 Tr. at 22; *see also* footnote 6, supra.)

19. Steiner Corporation, acting by and through Mr. Harris, directed J & H to incorporate the historic layered formula into the 1984 amendment, knowing that this would continue to make the lump sum more valuable than the annuity and knowing that J & H had previously and continuously recommended changing to a floating market rate. (*See* 8 Tr. at 19–23; Harris Dep. at 155.) [9] This was consistent with

---

9. The record is unclear whether this direction was given prior to the February 1985 meeting, after the meeting, or both. Nonetheless, the record is clear that at no time prior to the February 1985 meeting had Steiner intimated to J & H that it would consider changing the

Steiner's past practice and was the course of action Steiner, by and through Mr. Harris and Mr. Kane, communicated to J & H at all pertinent times. (*See* 8 Tr. at 19–23; Harris Dep. at 147, 155.)

20. Mr. Harris approved the 1984 plan amendments drafted by J & H, which incorporated the historic layered formula. (*See* 8 Tr. at 22–23; 2 Tr. at 254; Harris Dep. at 145.)

21. Kevin Steiner executed the amended Plan on October 30, 1985 without having read the plan amendments or any of the previous plans. (*See* OF & C ¶ 26, at 9.) In fact, with only one exception Kevin Steiner did not look at any of the Steiner files related to the pension plan prior to 1996, nor did he read any documents relating to the plan amendments. Kevin Steiner did read one document relating to the Steiner pension plan, the 1983 valuation which he read in preparation for the February 1985 meeting. (*See* 2 Tr. at 227–28, 231, 242–45.)

22. Other than attending the February 1985 meeting and reading the 1983 valuation, Kevin Steiner did nothing with respect to the Steiner plan or the plan amendments except to sign the plan amendments, unread. (*See* 2 Tr. at 242–45.) This is because Kevin Steiner was relying on Mr. Harris to administer the plan and oversee the plan amendments. (*See* 2 Tr. at 245–46; 8 Tr. at 22.)

23. Richard Steiner had little, if any, involvement with the retirement plan from its inception and never read it, but always relied on Fred Kane and others, including Daniel Harris, to make decisions regarding the plan. (*See* 1 Tr. at 99–100, 104–109.)

24. Only the Board of Directors of Steiner Corporation (the "Board"), on which Fred Kane continued to actively serve through and beyond October 31, 1985, could change benefits provided by the retirement plan. (*See* 1 Tr. at 96–100; Plaintiff's Exhibit P–246.)

25. In June 1986, J & H presented several options for reducing or compensating for the value differential between the lump sum and the annuity, including a "freeze" on the lump sum. (*See* OF & C ¶ 36, at 14; 1 Tr. at 88–89, 170; 2 Tr. at 193.) Essentially, this would have frozen any upward increase in the lump sum as computed under the historic layered formula. If the freeze were implemented, retiring employees who elected the lump sum would receive the greater of (a) a frozen in time lump sum computed under the old formula or (b) a lump sum calculated on the basis of the PBGC rates which would continue to grow in step with the annuity. (*See* 1 Tr. at 170; 2 Tr. at 193.) The Board chose not to implement the freeze, choosing the least aggressive option instead. (*See* OF & C ¶ 36, at 14; 2 Tr. at 193; 1 Tr. at 89–90.) The Board eschewed the freeze because it was concerned that if a freeze were adopted it would both disappoint employee expectations and cause morale problems. (*See* 1 Tr. at 89–90.)

26. Steiner's expert witness opined that a retroactive reduction in the amount of the lump sum would have done more harm to employee morale than the freeze. (*See* Volume V Transcript of Trial at 581–83 (Nov. 5, 1991) ("5 Tr.").) As noted above, the Board was unwilling to adopt the freeze for that very reason. (*See* 1 Tr. at 89–90.) Moreover, key decision-makers at Steiner Corporation, including members of the Board of Directors, would have been negatively affected by the freeze, just as they would have been affected negatively by the retroactive reduction in the lump sum which would have resulted if the layered formula had been abandoned. (*See* 2 Tr. at 299.)

27. Steiner employed the Wyatt Company as its actuary after terminating J & H. The Wyatt Company suggested that

---

liberal lump sum option for retiring employees. (*See* OF & C ¶ 45, at 17.) Furthermore, Steiner never changed or retracted its direction to J & H to incorporate the historic

layered formula into the Steiner plan and never directed J & H not to incorporate it into the plan.

Steiner might eliminate the lump sum completely, both retroactively and prospectively. (*See* 2 Tr. at 299–300.) Steiner Corporation's executive committee rejected that notion, deciding not to even take it to the Board because, among other reasons, Steiner did not want to annoy its employees. (*See* 2 Tr. at 300.)

28. Steiner did not carry its burden to establish that its injury was caused by Defendants' negligence. Steiner has not proven that, had it received the requested actuarial information and advice from J & H in a timely manner, it would have acted to eliminate retroactively the historic layered formula which was the reason the lump sum benefit was more valuable than the annuity.[10]

29. The acts of Steiner perpetuated use of the historic layered formula through the years. J & H was never hired, employed, instructed, or otherwise called upon to make or suggest changes to the way the lump sum benefit under Steiner's plan was calculated, at least not prior to 1986. In fact, each time J & H raised concerns regarding the use of the historic layered formula or suggested changing to a floating market rate J & H did so on its own initiative and each time the advice was soundly and promptly rejected by Steiner. Prior to 1986, the historic lump sum formula with its below market discount rates was not regarded by Steiner Corporation as something that needed to be corrected. Rather, Steiner considered the more valuable lump sum resulting from the use of below market discount rates as a situation to be perpetuated—an intended and desired part of the compensation package for loyal employees.

30. Defendants' actuarial negligence did not cause or even partially cause Steiner's failure to change the actuarial formula in the Plan. J & H did not cause Steiner to lose the opportunity to eliminate the historic layered formula retroactively. This court finds and concludes that defendant's professional negligence was neither the cause-in-fact nor the proximate cause of Plaintiff Steiner's injury.

### ANALYSIS OF CAUSATION ISSUE

During the last appeal before the Tenth Circuit Court of Appeals in *Steiner II*, defendants urged lack of causation, among other grounds, as an alternative basis for affirmance. Defendants argued that Steiner had never proved that it would have acted to avoid the injury, i.e., that it would have changed the lump sum formula before the October 31, 1985 deadline had defendants provided the requested actuarial information and advice in a timely manner. Concluding that it would be inappropriate, on appeal, to determine causation, a question of fact, the Tenth Circuit "le[ft] th[e] issue of causation of injury for the district judge to address in the first instance on remand ...." *Steiner II*, 135 F.3d at 693.

Defendant J & H, holding itself out to the public as a specialized expert in the actuarial field, is held to a heightened standard of care—that is, it must perform the services it undertakes to perform in accordance with the standard of care used by similar professionals in the actuarial community under similar circumstances. *See Steiner II*, 135 F.3d at 690 (holding that actuaries are held to a professional stan-

---

**10.** In this court's Findings and Conclusions dated January 24, 1992, this court found that, following the February 1985 meeting, J & H should have been alerted to the possibility that Steiner might reconsider its theretofore unswerving determination to maintain the historic layered formula. (*See* OF & C ¶ 30, at 11.) The court also made a finding that if defendants had provided the requested calculations "Steiner *could* have determined" to abandon retroactively the historic layered formula. (OF & C ¶ 29, at 11) (emphasis added).

These findings related solely to J & H's professional negligence. They did not address and were not intended to address the much different causation question whether Steiner in fact would have abandoned and retroactively eliminated the historic layered formula had J & H provided the calculations and actuarial advice in a timely manner. This court has not made an independent factual finding that Steiner would have so acted and now makes an express finding to the contrary.

dard of care). As this Court has previously held, J & H failed to meet the standard of care in the actuarial industry in two respects: (1) "by failing to provide calculations which had been requested as to the comparative value of the lump sum and annuity benefits prior to the deadline date for adoption of plan amendments," (OF & C ¶ 31, at 12); and (2) by failing to inform Steiner "that there were some in the actuarial community who believed that changes could be made so as to lessen the optional benefit if such changes were included in a Plan amendment before October 31, 1985," (OF & C ¶ 31, at 11–12).[11]

Thus, the relevant inquiry is whether defendant's failure to meet the standard of care in the actuarial community, in either or both of these respects, was the cause of Steiner's injury.

■ Under Utah law, to establish causation in a malpractice action the client must establish, by a preponderance of the evidence, that the professional's "breach of duty was the actual and proximate cause of the [client's] injury." *Bansasine v. Bodell,* 927 P.2d 675, 676 (Utah App.1996). To meet the first of these two causation hurdles, actual cause or causation-in-fact, Steiner must establish that but for defendants' professional negligence the injury would not have occurred. *See Kilpatrick v. Wiley, Rein & Fielding,* 909 P.2d 1283, 1290 (Utah App.1996). To meet the proximate cause hurdle, Steiner must establish that defendants' actuarial malpractice was "that cause which in natural and continuous sequence, (unbroken by an efficient intervening cause), produce[d] the injury and without which the result would not

have occurred.... the efficient cause—the one that necessarily set[ ] in operation the factors that accomplish[ed] the injury." *Bansasine,* 927 P.2d at 676. "Whether causation in fact and proximate cause have been established present *questions of fact.*" *Johnson v. Higley,* 989 P.2d 61, 72 (Utah App.1999) (emphasis added). This court has resolved those fact issues in favor of defendants. In this regard, this court has determined that Steiner did not meet its burden of proving causation and that the actuarial negligence of J & H was neither the cause-in-fact nor the proximate cause of Steiner's injury.

Kevin and Richard Steiner offered testimony to the effect that Steiner would have changed the lump sum formula if *they* had known of the disparity in value.[12] This is not dispositive because only the Board of Directors of Steiner Corporation (the "Board") could change benefits provided by the retirement plan. (*See* 1 Tr. at 96–100; Exhibit P–246.)

Fred Kane, who well knew of the disparity, continued to actively serve on the Board through and beyond October 31, 1985. The Board's action with respect to the Steiner Plan in 1986 is persuasive evidence that the Board would not have implemented such a retroactive change in 1985. Indeed, in June 1986 when J & H presented a number of options to reduce the cost of the more-valuable lump sum, the Board chose the least aggressive option, refusing to implement a "freeze" on the lump sum benefit. (*See* OF & C ¶ 36, at 14; 2 Tr. at 193; 1 Tr. at 89–90.) Even Steiner's own expert witness recognized

11. This finding as to J & H's professional negligence was affirmed by the Tenth Circuit. *See Steiner I,* 31 F.3d at 941 (holding "that J & H had a duty to provide the lump sum calculations requested by Mr. Steiner and to inform [Steiner Corporation] that it could change the Layered Formula to make the lump sum equivalent to the annuity, and that J & H breached its duty by failing to provide this information by October 31, 1985").

12. The knowledge or lack of knowledge of Kevin and Richard Steiner would not be dis-

positive. Even if Kevin and Richard Steiner, both officers and directors of Steiner Corporation, did not know that the lump sum was more valuable than the annuity, Steiner Corporation did know. *See Microbiological Research Corp. v. Muna,* 625 P.2d 690, 695 (Utah 1981) (holding that once a corporation is charged with notice or knowledge of a matter, such notice or knowledge continues to be imputed to the corporation notwithstanding any personnel changes). Steiner Corporation is not merely an alter ego of these individuals.

that a retroactive reduction in the amount of the lump sum would have done more harm to employee morale than the freeze that the Board was unwilling to adopt for that very reason. (*See* 5 Tr. at 581.) Furthermore, when the Wyatt Company, who succeeded J & H as Steiner's actuary, suggested that Steiner might eliminate the lump sum completely (both prospectively and retroactively) Steiner's executive committee rejected the notion because, among other things, it feared that such action might alienate and annoy Steiner's employees. (*See* 2 Tr. at 299–300.)

 The testimony of Kevin and Richard Steiner apparently led the Tenth Circuit, in *Steiner I*, to offer commentary on the evidence which this court mistakenly adopted as a finding by the circuit court.[13] It was and is the responsibility of this court, however, to render an independent finding because the trier of fact *alone* must judge the credibility of witnesses and determine the weight their testimony deserves. *See Federal Deposit Ins. Corp. v. Hamilton*, 122 F.3d 854, 860 (10th Cir. 1997). It is also exclusively within the province of the trier of fact to draw reasonable inferences from the facts and to resolve conflicts in the evidence. *See id.*[14]

This Court now vacates its statement in the prior Order on Remand that "J & H's negligence was at least a partial cause of Steiner's failure to change the actuarial formula in the Plan." (Order on Remand at 5.)[15] This statement was made under the mistaken conception that the circuit court had made a preemptive determination on the causation issue. After carefully reviewing the *Steiner I* opinion and thoughtfully considering the circuit court's discussion in *Steiner II* of J & H's argument that Steiner had failed to prove causation, this court concludes that the Tenth Circuit had no intention of making any preemptive factual determinations as to causation.[16] Rather, the circuit court's remand orders in *Steiner I* and *Steiner II* leave the issue of causation entirely open. *See Steiner I*, 31 F.3d at 941 ("[T]here still remain the issues of causation and damages; therefore, we REMAND ...."); *Steiner II*, 135 F.3d at 693 ("We conclude that the prudent course is to leave this issue of causa-

---

**13.** As noted above, the Tenth Circuit made the following comment, in *Steiner I*, during its analysis of this court's original determination that the layered formula used by Steiner to compute the lump sum could not be changed:

> [T]he record is clear that if Mr. Steiner, who was responsible for the administration of the Plan at the critical time in question, October 31, 1985, had known that the lump sum was more valuable than the annuity, then he would have opted to change the actuarial factors to reduce the lump sum so that it was equivalent to the annuity.

*Steiner I*, 31 F.3d at 940.

**14.** Indeed, the appellate court is not only bound by the reasonable inferences drawn by the trial court, it is also powerless to infer facts which the trial court has not inferred. *See Schwager v. Sun Oil Co.*, 591 F.2d 58, 62 (10th Cir.1979) ("A reviewing court is bound by reasonable inferences drawn by the trier of fact."); *Rasmussen Drilling, Inc. v. Kerr–McGee Nuclear Corp.*, 571 F.2d 1144, 1148 (10th Cir.1978) ("It is not the function of the appellate court to infer material facts or to make controlling inferences which the trial court [or jury] has not inferred or made ....").

**15.** The court also stated in the Order on Remand that "J & H's negligence was not the predominant cause of Steiner's injury." (Order on Remand at 8.) To the extent this or similar statements may contain an implication of causation by J & H, such are also vacated for the same reasons above stated.

**16.** The Tenth Circuit clearly has stated:

> It is not the function of the appellate court to infer material facts or to make controlling inferences which the trial court [or jury] has not inferred or made and which, if done, would, in effect, constitute a trial de novo.

*Rasmussen Drilling, Inc. v. Kerr–McGee Nuclear Corp.*, 571 F.2d 1144, 1148 (10th Cir. 1978) (alteration in original). *See also Federal Deposit Ins. Corp. v. Hamilton*, 122 F.3d 854, 860 (10th Cir.1997) (recognizing that the circuit court is "not empowered to undertake a review of the evidence which would amount to a trial de novo"); *Woods Const. Co., Inc. v. Pool Const. Co.*, 314 F.2d 405, 406 (10th Cir. 1963) ("The appellate courts ... do not have the power to review the evidence in the record and supply the findings of fact necessary to determine the issues").

tion of injury for the district judge to address *in the first instance* on remand ....") (emphasis added).

This court embraces its original finding, as noted in the Order on Remand, "that the evidence did not support Steiner's contention that it intended to ... change[ ] the Plan had it received J & H's new report in a timely manner." (Order on Remand at 4.) The chain of causation appears to both begin and end with Steiner. Steiner was the architect of the historic layered formula, knew the lump sum was more valuable than the annuity, understood the cumulative impact of the discrepancy, rejected J & H's advice to change the formula, specifically instructed J & H to put the formula into the amended plan, and approved the amended plan which incorporated the historic layered formula.

Steiner was aware that its plan was "cheap" and regarded the more liberal lump sum benefit as a part of the compensation package for loyal past service. In 1978, when Steiner rejected J & H's recommendation to change to the PBGC rate, Fred Kane explained that Steiner was aware that its employees had certain expectations with regard to the benefits generated by the use of the below market discount rates and did not want to disappoint them in those expectations. Even after 1985, the Board chose not to implement a "freeze" on the lump sum and Steiner's executive committee eschewed advice to eliminate the lump sum entirely, in both cases because Steiner feared disappointing employee expectations and injuring employee morale.

Based upon the foregoing, this court finds that the evidence as to causation preponderates in favor of the defendants. Steiner has failed to carry its burden of proof with respect to causation. Defendants' professional negligence was neither the cause-in-fact nor the proximate cause of Steiner's failure to change the formula for computing the lump sum before the critical October 31, 1985 date. Thus, Steiner has suffered no damages on account of

J & H's failure to provide the requested calculations and actuarial advice in a timely manner.[17]

IT IS SO ORDERED.

**17.** The court does not reach the issues of comparative negligence and damages.